Consolidated Home Specialties Company, Appellant, *v.* Plotkin.

Argued September 30, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

re-argument refused November 24, 1947.

*Donald B. Hirsch,* with him *Leonard M. S. Morris,* for appellant.

*John A. Metz, Jr.,* with him *John A. Metz, Herbert B. Lebovitz* and *Metz & Metz,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, November 10, 1947:

The first question in this case is whether or not the defendant has unlawfully appropriated a trade name. A further question is whether the complainant is estopped from obtaining equitable redress on the grounds of its acquiescence.

Complainant, a Pennsylvania corporation, organized in 1938 for the purpose of selling home furnishings at retail on the installment plan by house to house solicitation, took over the business of the Pittsburgh division of the Consolidated Home Furnishing Company, a corporation registered in this Commonwealth in 1926 to engage in a similar business, having its principal office in Philadelphia. The latter Company, after 1938, restricted its operations to the Eastern part of Pennsylvania. The complainant conducted its business from 1938 to 1943 in the Western part of Pennsylvania, establishing its main office in Pittsburgh and branch offices, with branch managers in charge thereof, at Kittanning,

Johnstown, Altoona, New Castle, and Canton, Pennsylvania, at Steubenville and Youngstown, Ohio, at Jamestown, New York, and at Clarksburg, West Virginia.

Due to the curtailment of the supply of merchandise and other "war conditions" the Consolidated Home Specialties Company in the early part of 1943 undertook to sell to the branch managers employed by it the accounts receivable of their respective branch offices, the equipment of those offices, and in some cases, supplies of merchandise. In this manner the branch offices of Kittanning, Uniontown, Steubenville, Johnstown, and Clarksburg were disposed of. Plaintiff retained its principal office in Pittsburgh and continued to operate the wholesale part of its business.

On April 21, 1943, the plaintiff company sold the accounts receivable, equipment and certain merchandise of the Kittanning branch office to Arthur Plotkin, defendant, who was its manager prior to and at that time. It also sold to him the accounts receivable in the contiguous territorities of Oakmont, Verona and Aspinwall, in Allegheny County, formerly handled by the main Pittsburgh office. From April 21 to July 15 the defendant, as an individual under the registered fictitious name of "Armstrong Home Furnishings Company", operated the business of selling items of merchandise similar to those sold by the plaintiff on the installment plan by house to house canvassing in the same area and territory formerly served by the plaintiff. His office was maintained in the same location formerly occupied by plaintiff's Kittanning office. On or about July 15, 1943, defendant adopted and registered the fictitious name "Consolidated Home Supply Company" and continued to use the same until the filing of plaintiff's bill.

On March 19, 1945, plaintiff filed a bill in equity against the defendant setting forth, inter alia:

"Sixth. Defendant, after separating from the employ of the plaintiff, organized his own business of selling

home furnishings on the instalment plan by house to house solicitation under the name of Armstrong Home Furnishings Company, with principal place of business in Kittanning, Armstrong County, Pennsylvania. Defendant operated this business in Armstrong County and Allegheny County, Pennsylvania, soliciting plaintiff's customers and others:

"Seventh. At some time before March 7, 1944, defendant changed the trade name of his business from Armstrong Home Furnishings Company to Consolidated Home Supply Company, and has continually used the latter name in connection with his business, on his stationery and printed matter and in his dealings with both sellers and purchasers of home furnishings.

"Eighth. Defendant has also used the name of Consolidated Home Specialties Company, identical with plaintiff's name, in connection with the operation of his business.

"Ninth. Plaintiff, by its president, Samuel Lobel, has repeatedly remonstrated with defendant since learning of the defendant's use of the name 'Consolidated Home Supply Company' in connection with defendant's business, and protested against the use of said name by defendant, but defendant refused and still refuses to discontinue the use of said name in the conduct of his business."

"Eleventh. Defendant's above described activities will inevitably in the future and in fact already have produced confusion in the minds of the public. Defendant's actions are calculated to mislead the public in the belief that purchases from defendant are purchases from the plaintiff.

"Twelfth. Plaintiff is informed, believes and therefore avers that said action of defendant in adopting and using the names Consolidated Home Supply Company and Consolidated Home Specialties Company was taken by the defendant in fraud of the rights of the plaintiff and so to confuse and deceive the public and to obtain

business under the impression that said public is dealing with the plaintiff, and to damage and injure the plaintiff and to deprive the plaintiff of the value of the trade name Consolidated Home Specialties Company."

Plaintiff then avers irreparable damages and prays for an injunction restraining the defendant, his servants, etc., from using the name "Consolidated" in connection with any business of selling home furnishings on the installment plan by house to house solicitation and restraining the defendant, his servants, etc., from representing by statements, advertising, etc., that said defendant, his servants, etc., are in any manner connected or associated with, employed by, agents for or representative of the plaintiff. Damages and further relief are also asked for.

The plaintiff supplied articles of merchandise to the defendant for resale from the time of the sale of its accounts receivable until July 1944. Plaintiff, through its president, Samuel Lobel, also furnished defendant with bailment leases and other forms necessary for the conduct of his business. In September 1945 plaintiff again resumed the retail phase of its business, i. e., sales on the installment plan by house to house solicitation. The court below dismissed plaintiff's bill on the basis of the following "conclusions of law":

1. The trade name "Consolidated Home Supply Company" used by the defendant is not deceptively similar to the name "Consolidated Home Specialties Company" used by the plaintiff corporation and its use can therefore not be enjoined.

2. The delay of the plaintiff in filing its bill in the instant case, coupled with conduct which constituted acquiescence in defendant's use of the name so that to deprive the defendant of the right to use its trade name would now work to defendant's disadvantage, bars the plaintiff from equitable relief either by an accounting or by injunction against defendant.

3. Plaintiff's conduct in the instant case amounts to more than mere laches in the sense of delay to bring suit and constitutes an acquiescence in defendant's use of the name.

The general rule is that a corporation has a right to its name and another will be restrained from its use: 7 R. C. L. page 134, section 104, 14 Corpus Juris 310, 326, section 374, 396; Thompson on Corporations, section 284-296; Pennsylvania Business Corporation Law of 1933, as amended, section 202, 15 PS 2852-202.

The right of the corporation to the exclusive use of its own name exists at common law, and includes the right to prohibit another from using a name so similar to the corporate name as to be calculated to deceive the public. The corporate trade-mark from the necessity of the thing, and upon every consideration of private justice and public policy deserves the same consideration and protection in a court of equity, because the corporate name is a necessary element of the corporation's existence, and without it the corporation cannot exist. See *Newby v. Oregon C. R. Co., Deady,* 609 Fed. Cas. No. 10,144; *Investor Pub. Co. v. Dobinson* (C. C.) 72 Fed. 603; *Koehler v. Sanders,* 122 N. Y. 65, 9 L. R. A. 576, 25 N. E. 235; *Merchants' Detective Assn. v. Detective Mercantile Agency,* 25 Ill. App. 250. As was said by the Court of Appeals of Maryland in *Drive It Yourself Company v. North,* 130 Atl. 57, 43 A. L. R. 206: "The courts are solicitous to prevent unfair competition in business, and to protect against unfair practices persons who have established and developed a business, service, or product stamped in the public mind with the impress of the builder's skill or reputation, but the courts are equally solicitous to encourage fair competition and thus protect the public against the evils which flow from private monopolies."

It is our duty to determine whether or not the evidence supports the findings of the court below and whether or not its legal conclusions are sound.

The question as to the unfairness of competition is primarily a question of fact and the test is whether the public is likely to be deceived. Chief Justice FRAZER in *Scranton Stove Works v. Clark et al.*, 255 Pa. 23, 99 A. 170, in an opinion for this Court, said: "To constitute an infringement of a trade-mark a literal copy is not necessary. The test is whether the label or mark is calculated to deceive the public and lead them to suppose they are purchasing an article manufactured by a person other than the one offering it for sale: Pratt's App., 117 Pa. 401 [11 A. 878]. The same principles apply to unfair trade competition. 'The general rule is that anything done by a rival in the same business by imitation or otherwise, designed or calculated to mislead the public in the belief that in buying the product, offered by him for sale, they were buying the product of another's manufacture, would be in fraud on that other's rights and would afford just ground for equitable interference': Juan F. Portuondo Cigar Mfg. Co. v. Vicente Portuondo Cigar Mfg. Co., 222 Pa. 116, 132 [70 A. 968]. A fraudulent intent in such cases need not always be shown."

In *American Clay Mfg. Co., a corporation of Penna., v. American Clay Mfg. Co., a corporation of N. J.*, 198 Pa. 189, 47 A. 936, this Court, in an opinion by Mr. Justice MITCHELL, said: "There are two classes of cases involving judicial interference with the use of names, first, where the intent is to get an unfair and fraudulent share of another's business, and second, where the effect of defendant's action, irrespective of his intent, is to produce confusion in the public mind and consequent loss to the complainant. In both cases the courts of equity administer relief without regard to the existence of a technical trade-mark." Justice MITCHELL cites the case of *North Cheshire & Manchester Brewery Co. v. Manchester Brewery Co.*, Law Reps. App. Cases (1899), 83. In that case the House of Lords affirmed the decision of the

Court of Appeal, enjoining the defendant from taking even as a second or subordinate part of its corporate title, the name of an older corporation. Justice MITCHELL said: "It was held that as a matter of fact the name of the appellant company was calculated to deceive, and that the appellant must, therefore, be restrained by injunction in the usual way. HALSBURY, Lord Chancellor, said, 'The real question is in a single sentence. *Is this name so nearly resembling the name of another firm as to be likely to deceive?*'" (Italics supplied.) Justice MITCHELL also cites the case of *Holmes Booth & Haydens v. Holmes, Booth & Atwood Mfg. Co.,* 37 Conn. 278. He says: "A company had been formed including in its corporate title the names of Holmes and Booth, two of its stockholders and directors. Some years later, Holmes, Booth and other stockholders formed a new corporation which assumed the name of Holmes, Booth & Atwood Mfg. Co. On a bill by the first corporation the Supreme Court of Errors of Connecticut enjoined the use of Holmes and Booth's names in the title."

In an action for trade-mark infringement, the burden of proof is on the plaintiff to show that the name used by the defendant is calculated to deceive ordinary purchasers and to create confusion in the trade. Plaintiff is under no obligation to prove a fraudulent intent or motive on the part of defendant. In the instant case, the chancellor found that the names employed by the respective parties are not so similar as to induce the public to purchase defendant's supplies under the erroneous belief that they are dealing with the plaintiff.[1]

---

[1] The following appears in an article in 8 Michigan Law Review (1910) page 613, captioned "The Unwary Purchaser": "The person to be considered, the courts say is not . . . the expert or the careful person, but the normal, every day purchaser; or, as some judges have designated him, . . . the inattentive purchaser . . . or the unwary purchaser. . . . He is likely in making his purchase to act on the moment and is not bound to study or reflect . . . He is not supposed to know that imitations exist. . . . Some courts have gone so far

Plaintiff contends that this finding of fact is against the weight of the evidence. By the testimony of its witness Samuel Lobel, president of plaintiff company, evidence of confusion in the delivery of mail and in telephone calls as a result of the similarity between plaintiff's and defendant's trade names was established. There were exhibits in evidence of pieces of mail received by the plaintiff which were not intended for the plaintiff. Among them were included a "credit memorandum" from "the Columbia Mills of New York", a "statement of bills due to the Renard Linoleum and Rug Company of St. Louis Missouri", a "letter of reference inquiry from the Bankers Indemnity Insurance Company", a "letter received from Mr. M. J. Grayson of the Columbia Mills here in Pittsburgh", "a letter received from the Pennsylvania Railroad", a "card received by mail from the National Manufacturing Company" and other similar specimens, all of which were intended for the defendant. In addition, numerous telephone calls were erroneously placed with the plaintiff which related to defendant and his business.

In *Potter v. Osgood,* 79 Pa. Superior Ct. 397, Judge KELLER said: "The evidence in the case proves that trouble and confusion have resulted to the plaintiff from the use of his trade name by the defendant and are likely to, in the future, from its continued use. This is especially the case with respect to correspondence and the mails. Bills of lading passing the possession and ownership of car loads of merchandise, varying in value from five thousand dollars to sixty thousand dollars apiece, are sent by mail addressed to Pittsburgh Distributing Company. The likelihood of delay in the delivery of these bills of lading, with a consequent delay in the delivery of the merchandise, as well as the possibility of their total diversion, constitutes a very real basis of

---

as to hold that he has a right to be careless and that the use of a mark or label will be enjoined where deception is a probable or even a possible consequence."

threatened loss and injury, for which there is no ade-qate remedy at law, and furnishes a valid reason for equitable relief, if otherwise justified."

Mrs. Edna Bigley, plaintiff's witness, testified that subsequent to the sale of plaintiff's accounts receivable to defendant, i. e., after April 1943, she placed an order for merchandise with "Bill Garris" who was formerly connected with the Consolidated Home Specialties Company as an agent. Her testimony indicated that she was not aware that Mr. Garris was no longer associated with the plaintiff company, and she presumed he was still accepting orders for the latter. She stated after being questioned as to her purchases, "Well, I had got six sheets and one was damaged and I wrote into Consolidated Home Specialties about it, after waiting approximately a year." In reply to the question "And what did you learn as a result of writing to the Consolidated Home Specialties Company?" she answered "They answered by stating he [Mr. Garris] did not work for them no longer".

Mrs. John Koricansky revealed that "a lady came to my [witness'] house and she said she was married, she is married and her husband is in the service, and she said she is from 'Consolidated.' I said, 'Specializing Company?'. She said, 'Yes'. I said, 'Oh, my girl friend bought from you.' She said, 'Yes'. Then I told her that— 'What are you selling?' And she says, 'Oh, different sorts of things.' So I bought drapes and curtains, and she told me I had to have so much down, which I think, I am not sure, I put $9.50 down, and then my husband came home and he said, 'You got gypped.' " This testimony was ob-jected to and the following question was asked: "Never mind about your husband. What happened to the mer-chandise you bought from her?" She responded, "It was too expensive and I had to return it." She stated that she called up the Consolidated Specializing Com-pany and told them that she bought some things that she could not very well keep and would like to have her

money back. When she was asked, "After you made a telephone call did you still think that you had bought it from Consolidated Home Specialties Company?" she answered, "Yes, I thought I had".

Another witness, Mrs. Margaret Brown said that "a saleslady came to my door, and when she said she was from Consolidated I told her I had dealt with the people before and she said she would be very glad to have me back as a customer". "Q. When you told her that you had done business with her company before, did she have anything to say about that? A. No, just that she was glad that I would be a customer again." In cross examination she was asked "When you bought these goods [referring to merchandise purchased by the witness] and got this paper [defendant's bill], it showed very plainly the name of the company you were dealing with, didn't it? A. Yes, it did. Q. When this woman came in she told you she was from Consolidated Home Supply Company? A. She just said Consolidated, she didn't give any other name."

Mrs. Helen Signori on direct examination stated that an agent from the Consolidated Home Supply Company approached her, introducing himself merely as "This is Consolidated". The following question was submitted to her on cross examination: "Q. And the man who sold to you did not claim to be working for any other company, did he? A. He just said Consolidated. I didn't know. I thought it was the same company I bought from before, the Specialties."

Mrs. Gloria Cook was asked on direct examination "Have you, within the last year, made any purchases from a door to door salesman who came to your house? A. Yes. Q. Will you tell us how that person introduced himself to you when he came? A. He came to the door and said, 'Consolidated, would you like to buy some curtains and some furnishings?' " Her further testimony indicated that the lady up stairs had been dealing with the Consolidated Company (Consolidated Home Special-

ties Company) and she had asked her to send her sales-men around. When she was asked, "Q. What happened in respect to the curtains after you bought them?" [referring to witness' purchase from Consolidated Home Supply], she answered, "I decided after I had made the purchase that they were too expensive and I wanted to give them back, so we looked in the phone book and found Consolidated Home Furnishing Company and we called them, and they didn't specify there were two companies with the first name beginning Consolidated." In cross examination the following question was posed: "Q. So when the salesman came to see you from Consolidated Home Supply Company you bought some merchandise from him? A. Under the impression it was Consolidated Home Specialties, the company my mother had bought from."

This testimony shows that the trade name "Consolidated Home Supply Company" assumed by the defendant is so close an imitation of plaintiff's trade name as to confuse that part of the public dealing with these respective parties. The law will not sanction the assumption of a deceptively similar name in order that the appropriator may capitalize on the good will and reputation established by plaintiff company. It was held in *Olympia Brewing Co. v. Northwest Brewing Co. et al.,* 178 Wash. 533, 538, 35 P. 2d 104, where the names used were "Olympia" and "Olympic" beer: "No inflexible rule can be laid down as to what conduct will constitute unfair competition. Each case is, in a measure, a law unto itself. Unfair competition is a question of fact. The question to be determined in every case is whether or not, as a matter of fact, the name or mark used by defendant has previously come to indicate and designate plaintiff's goods, or, to state it another way, whether defendant, as a matter of fact, is by his conduct passing off his goods as plaintiff's goods, or his business as plaintiff's business. The universal test question is whether the public is likely to be deceived." See *Peters Packing Co., Inc., v. Oswald and Hess Co.,* 334 Pa. 272, 276.

In the case of *A. Hollander & Son, Inc., v. Jos. Hollander, Inc., et al.,* 175 A. 628, the Court of Chancery of New Jersey, enjoined the defendant corporation and Joseph Hollander from using the name "Hollander" either as one or as a component part of any trade name in the business of dressing and dyeing furs. In that case the court said: "It is not necessary that the complainant, in order to succeed, should prove actual fraud by the defendant, or that any single person was deceived. It is sufficient if, in the opinion of the judge, the symbol or device or get-up used by the defendant is one which so closely resembles the symbol, device, or get-up used by the complainant as to be likely to deceive the public . . . 'The idea that a man has a right to use his name as a part of the name of a corporation in which he is interested, without regard to the effect of such use in the way of accomplishing deception and fraud, precisely as a natural person can use his own name, has, I think, in this state, been exploded. . . .'"

The court in enjoining defendant from using the trademark "Aunt Jemima's" said in *Aunt Jemima Mills Co. v. Rigney & Co.,* 247 Fed. 407, a case where plaintiff manufactured and sold "Aunt Jemima's" flour and defendant sold "Aunt Jemima's" pancake syrup:[2] "It is

---

[2] The following decisions of the English courts were cited in the aforementioned case:

"Dunlop Pneumatic Tyre Co. v. Dunlop Lubricant Co., 116 Reports Patent Cases, 12: In 1888 the word 'Dunlop' was first used by complainant's predecessors to designate goods manufactured by them. Complainant made bicycle tires, rims, pumps, etc. One Funt started in business as the 'Dunlop Lubricant Co.,' and dealt in oils and lubricants for bicycles, which he sold in packages bearing the word 'Dunlop' in large letters. Complainant had never dealt in oils or lubricants. Held, that the use of the word 'Dunlop' by defendant was deceptive, and it was enjoined.

"In Valentine Meat Juice Co. v. Valentine Extract Co., 17 Reports Patent Cases, 673, the complainant used the word 'Valentine' upon liquid meat extracts for medicine. Defendant used the word 'Valentine' on beef extract used for food. An injunction was granted.

said even a technical trade-mark may be appropriated by any one in any market for goods not in competition with those of the prior user. This was the view of the court below in saying that no one wanting syrup could possibly be made to take flour. But we think that goods, though different, may be so related as to fall within the mischief which equity should prevent. . . . [These products] are . . . commonly used together. . . . It will enable them to get the benefit of the complainant's reputation and advertisement. These we think are property rights which should be protected in equity."

The Third Circuit Court of Appeals, 84 Fed. (2d) 387, enjoined Bernett & Rosenfeld, who registered their drug store in Philadelphia as "Macy's Drug Store" under the Fictitious Names Act, from using the word "Macy". The court said that the use of the word "Macy's" "was intended to, and had a tendency to, mislead and deceive the public into the belief that the defendants' business was connected with that of the plaintiff . . . there was a palpable attempt to make use of the plaintiff's reputation and good will, acquired through many years of advertising, and appropriate it to the benefit of the defendants and deceive the public."

"Dunlop Pneumatic Tyre Co. v. Dunlop-Truffault Cycle & Tube Manufacturing Co., 12 Times Law Reports, 434: This was a motion for a preliminary injunction to restrain the defendant from using the name 'Dunlop' as a part of its corporate style. Complainant was the manufacturer of pneumatic tires, defendant the manufacturer of bicycles and steel tubes used in the manufacture of bicycles. An injunction was granted. Mr. Justice CHITTY holding that the name 'Dunlop' had been chosen by the defendants to create confusion in the minds of the public and make them think that the defendant company was connected with that of the plaintiffs.

"Premier Cycle Company v. Premier Tube Company, 12 Times Law Reports, 481: This was a motion for a preliminary injunction to restrain the defendants from using the word 'Premier' as a part of their business style. Complainant was a manufacturer of bicycles and tubes used in their construction. The defendants stated that they were tube manufacturers and had no intention of competing with the complainant in the making of bicycles. An injunction was granted."

The Circuit Court of Appeals (10th Circuit), 56 Fed. Rep. (2d) 973, enjoined the Standard Oil Co. of New Mexico, Inc., at the suit of the Standard Oil. Co. of California, from using any corporate name which contains the words "Standard. Oil Company" or words so similar thereto in sound or appearance as to lead to confusion or uncertainty. The court said: "With a practically unlimited field of distinctive names open to it for choice, defendant selected the name 'Standard. Oil Company.' It could have had but one object, namely, to improperly obtain advantage of the good-will associated with the name 'Standard Oil' and to take and commercially use as its own a commercial asset that belongs to another, to the detriment of that other and the public."

The Chancellor, in deciding the instant case, made the following statements: "At the time that the plaintiff corporation was incorporated there was an existing Pennsylvania corporation named 'Consolidated Home Furnishings Company' engaged in the same business. Notwithstanding that fact, the Department of State permitted the incorporation of plaintiff corporation. The fact that the Department of State permitted the plaintiff to use the name 'Consolidated Home Specialties Company' evidences the fact that it did not consider that name deceptively similar to the name of the existing corporation, 'Consolidated Home Furnishings Company'. Further, the evidence adduced at the trial fails to establish the fact that the public was misled by the alleged similarity between the names. We therefore conclude that there is no deceptive similarity between the trade name of the plaintiff corporation and that under which the defendant operates."

The fact that the Department of State permitted the plaintiff to use the name "Consolidated Home Specialties Company" is not res adjudicata of the question whether or not the trade names "Consolidated Home Specialties Company" and "Consolidated Home Supply Company" are deceptively similar. An executive agency, such as the Department of State, does not expect its

acts to be accepted as acts of the judiciary. Whether it considered the name whose use it "permitted" "deceptively similar" to the name already lawfully in use or did not consider the question at all, is immaterial to this proceeding.

That the defendant, by appropriating a name closely resembling that used by plaintiff, got the benefit of the reputation plaintiff had earned is without question. It is clear that defendant by his own testimony reveals his consciousness of some degree of wrong-doing in the appropriation of the name. He testified: "I was not altogether sold on the—well, goodness or quality of the name I choose to use as a trade name, and later I figured I could find a name that would be more comprehensive and less localizing than Armstrong." We find there is such a degree of similarity in the two names that those purchasers exercising ordinary prudence would be likely to be confused and misled.

We find no merit in defendant's plea of plaintiff's acquiescence. Defendant avers: (1) Plaintiff company by its president led defendant to believe that it was withdrawing from the retail end of its business and would not compete with the defendant but would continue doing business only to the extent of supplying its various branch managers who purchased its branches from it with merchandise for resale in the future. (2) Because plaintiff did in fact discontinue its retail business and resumed it six months after filing its Bill, defendant was led to believe that plaintiff abandoned the use of its name in the business of selling home furnishings at retail. (3) Acceptance of defendant's checks bearing its trade name constituted acquiescence. (4) Plaintiff was aware of defendant's use of the trade name "Consolidated Home Supply Company" but stood idly by and encouraged the defendant in a continuation of the use of the name and building of business and goodwill thereunder without making objection. (5) Plaintiff's sale of its accounts receivable to other branch man-

agers and the latter's use of a name similar to plaintiff's constituted a general, over-all course of conduct which had the effect of encouraging the defendant and lulling him into a sense of security with reference to the use of his trade name and in the devotion of time, effort and money to the building of a business and goodwill thereunder. Defendant refers to these acts attributed to the plaintiff as "affirmative" or positive acts of acquiescence, not merely "negative" conduct.

In considering the defense of acquiescence in the use of another's trade name, it must be borne in mind that the protection given by the law to a trade name is for the benefit of the public as well as for the protection of the owner's property rights in the trade name. When a product sold under a trade name receives public acceptance, the state is solicitous that its citizens be not imposed on by some one who sells a competitive product under a name so similar to the name the public is accustomed to as to be deceived thereby.[3]

If the owner of a trade name acquiesces so long in the use of that name or in a name strikingly similar thereto that the public has in general become aware of the other's appropriation of that name and is therefore not deceived, such owner may in a proper case be treated as having abandoned his one-time property rights in that name.

Nims on Unfair Competition and Trade-Marks, 3rd Edition, in discussing the case of *Ford v. Foster*, L. R. 7 ch. 611-1872, says: "Then what is the test by which

---

[3] By way of analogy, we cite the fact that an individual is not permitted to have his name changed by judicial action when the adjudicating court is convinced that the public's interest would be prejudiced by the change requested. This court said in the *Falcucci Name Case*, 355 Pa. 588, 592, 50 A. 2d 200: "When a petitioner for a change of name is a competitor of a highly successful person whose name he wishes to assume there is reasonable ground for suspicion that his motive in seeking a change of name is an unworthy one, and a due regard for both the public interest and for the person whose name is coveted would constrain a court to deny his petition."

a decision is to be arrived at whether a word which was originally a trade-mark has become publici juris. I think the test must be, whether the use of it by other persons is still calculated to deceive the public, whether it may still have the effect of inducing the public to buy goods not made by the original owner of the trade-mark as if they were his goods. If the mark has come to be so public and in such universal use that nobody can be deceived by the use of it, and can be induced from the use of it to believe that he is buying the goods of the original trader, it appears to me, however hard to some extent it may appear on the trader, yet practically, as the right to a trade-mark is simply a right to prevent the trader from being cheated by other persons' goods being sold as his goods through the fraudulent use of the trade-mark, the right to the trade-mark must be gone."

In the case of *Menendez v. Holt*, 128 U. S. 514, in which plaintiffs were the owners of a certain trade-mark for flour which consisted of the words "La Favorita", it was held that plaintiffs were entitled to the exclusive use of this name and to a perpetual injunction against a retiring member of the firm that owned that name, who put his own name on flour which he sold, in connection with the name "La Favorita". In that case Chief Justice FULLER said: "The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. . . . Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, 'it lasts no longer than the silence from which it springs. It is, in reality, no more than a revocable license.' " (Citing cases).

In *Thomson-Porcelite Co. v. Harad*, 356 Pa. 121, 51 A. 2d 605, this court affirmed the decree of the court below restraining the defendant from using the name "Porcelene", which was adopted and used by them for

five or six years prior to the institution of the action. The plaintiffs had been using the trade name "Porcelite" to identify a certain enamel paint manufactured and sold by it since 1892. This name "Porcelite" was registered in the United States Patent Office on February 18, 1908. "As a result of the advertising and use of the name in connection with the sale of its product throughout the United States, 'Porcelite' has become favorably known in the trade and among the general public, and as identifying the product of appellee." In that case the appellants contended, inter alia, that the name "Porcelene" was not deceptively similar to "Porcelite", also that plaintiff was barred by laches. This Court in an opinion by Mr. Justice PATTERSON, in overruling appellants' contention, said quoting from an earlier case: " 'It is not necessary that the public should be actually deceived in order to afford a right of action. All that is required is that the infringement should have a tendency to deceive.' "

As to the contention that the appellee was barred by laches, the opinion quoted from *Klepser v. Furry,* 289 Pa. 152, 159, 137 A. 175, as follows: " 'In suits for unfair competition or infringement it is well settled that mere laches in the sense of delay to bring suit does not constitute a defense. Such laches may bar an accounting for past profits, but will not bar an injunction against a further continuance of the wrong.' "

The case of *Keith Co. v. Greenberg* (N. J.), 34 A. 2d 639, is similar in its facts to the instant case. The trade name in controversy was "Walk-Over". The plaintiff, a shoe manufacturer and seller, had used the name "Walk-Over" since 1874. In an action to restrain the defendant from using this name, the defense was that the defendant "continued to operate his store under the name 'Walk-Over' from 1939 down to the present with the full knowledge, acquiescence and consent of the complainant; . . . that the complainant is without 'clean hands' in that it encouraged and directed him, as

well as other dealers, to advertise as 'Walk-Over' stores and to conceal from the public the fact that other shoes sold by them were not in fact 'Walk-Over' shoes . . ." The court in granting plaintiff an injunction against infringement of its trade name only said, inter alia: "Neither acquiescence nor laches is in the instant case a bar to injunctive relief, although such defense would bar the right of accounting for profits earned by the defendant during the period of such acquiescence or laches if such accounting for profits were sought."

See also *Majestic Mfg. Co. v. Kokenes* (Ala.), 67 Fed. Supp. 282; *Aunt Jemima Mills Co. v. Rigney & Co.*, supra; *Atlas Assur. Co. v. Atlas Ins. Co.* (Iowa), 112 N. W. 232; *Sartor v. Schaden*, 125 Iowa 696, 101 N. W. 511.

The decree of the court below dismissing plaintiff's bill and denying the relief prayed for is reversed; it is ordered that the bills be reinstated and a decree be entered in conformity with this opinion; appellee to pay the costs.

Mr. Justice DREW dissents.