**ANHEUSER–BUSCH, Inc. v. DU BOIS·
BREWING CO.**

No. 9527.

United States Court of Appeals
Third Circuit.

Argued Jan. 21, 1949.

Decided May 12, 1949.

Rehearing Denied July 27, 1949.

GOODRICH, Circuit Judge, dissenting.

Elder W. Marshall, Pittsburgh, Pa. (John C. Bane, Jr., Sherman T. Rock, and Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Leo R. Brockbank, Du Bois, Pa., on the brief), for appellant.

Wallace H. Martin, New York City (Alter, Wright & Barron, Pittsburgh, Pa., attorneys for plaintiff-appellee, Minturn De S. Verdi, Walter J. Halliday, and Marion L. Severn, New York City, Alexander J. Barron, and James Milholland, Pittsburgh, Pa., Nims, Verdi & Martin, New York City, and Shepley, Kroeger, Fisse & Ingamells, St. Louis, Mo., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN, and O'CONNELL, Circuit Judges.

O'CONNELL, Circuit Judge.

We are called upon to decide whether or not the district court erred in granting plaintiff ("Anheuser") a permanent injunction against the use of the words "Budweiser" and "Bud" by defendant ("DuBois") in connection with beer or any similar or related product.[1] The claim of Anheuser is grounded upon its assertion of a common law trade name.[2] The parties are in federal court by reason of diversity only, and Pennsylvania law controls.

Two principal issues are presented: (1) Has Anheuser established its common law right to the name of "Budweiser" as its exclusive trade name? and (2) if so, is Anheuser entitled to an injunction under the circumstances disclosed by this record?

Certain facts are not in dispute. The name "Budweiser" traces its origin to Budweis, also known as Budejovice, a Bohemian town with some reputation for the beer brewed there. In 1876, one Conrad, a St. Louis beverage dealer, first applied the name to a beer brewed in the United States.

Conrad obtained a registered trade-mark for "Budweiser" in 1878.[3] About 4½ years later, the Anheuser-Busch Brewing Associ-

[1] The lower court did not order an accounting because of a prolonged delay by Anheuser which we discuss in a later portion of this opinion. Anheuser did not appeal from that determination. The opinion of the district court is reported at D.C.W.D.Pa.1947, 73 F.Supp. 338.

[2] At the outset of the trial in the court below, Anheuser declared that its cause of action would not be based upon its trade-marks registered under federal legislation.

[3] In the proceedings, the Patent office objected to registration of the trade-mark

ation ("the Association"),[4] manufacturer of this beer for Conrad, was given permission by him to sell with his trade-mark such "Budweiser" beer as the Association had on hand.

In 1886, Conrad registered a second trade-mark for "Budweiser." Twenty-five days later, the Association (predecessor of Anheuser) also applied for a registered trade-mark involving a representation of the words "Original Budweiser." The Patent Office rejected the application on the basis of Conrad's 1878 registration. The Association replied that "there is nothing in common between the parties in the manner in which they use the words 'Original Budweiser' to which words no one can have an exclusive right." The Examiner then declared that "The words 'Original Budweiser' * * * are public property and cannot of themselves constitute a trade-mark." The Association eventually was granted registration of a trade-mark readily distinguishable in arrangement from Conrad's.

In 1891, Conrad sold out to the Association. Between 1891 and 1898, the Association sold 785,970 barrels of "Budweiser" beer, with sales continuing to grow thereafter, so that in 1905 alone the Association sold the equivalent of 444,265 barrels; in 1945 Anheuser, its successor corporation, sold the equivalent of more than 3,000,000 barrels.

In the period prior to 1905, the word "Budweiser" was also used by a number of other persons to designate their beer. These may be divided into two groups: (1) Importers selling European beer, who, except during the effective period of the 18th Amendment, continued to sell such beer in the United States until shortly before trial of the instant case, and (2) persons selling domestic beer, who, with one minor exception, were dissuaded, by legal action or otherwise, from continuing to use the name.

In June of 1905, Du Bois, owner of a brewery which (until 1945) never has sold more than 90,000 barrels of beer annually, began selling some of its beer under the name "DuBois Budweiser." The labels on the bottles were and still are vastly different from those of the Association and Anheuser. The record amply supports the finding of the court below, however, that DuBois began marketing "DuBois Budweiser" with full knowledge of the extensive use of the word "Budweiser" by the Association. Several months later, DuBois applied for a registered trade-mark, in which application DuBois laid claim to the word "Budweiser" for beer, ale, and porter. The Association successfully opposed that application.

After also making timely demand that DuBois discontinue using the name, the Association (predecessor of Anheuser) took the controversy to court in September, 1908, by filing a bill of complaint in the federal court for the Western District of Pennsylvania. The bill sought a permanent injunction against the use of the word "Budweiser" by DuBois. DuBois filed an answer in due course. In August, 1909, the Association moved for, and was granted, a discontinuance, to which DuBois agreed. With that, the controversy remained dormant until the filing of the instant complaint in April, 1940. It is not inapposite to note that Anheuser and the Association brought nine other suits in protection of the name "Budweiser" between 1920 and 1939, besides inducing others, without court action, to refrain from using "Budweiser" and "Bud," but that no communication with DuBois, formal or otherwise, was had on this subject during that entire period; and that Anheuser and its predecessor Association advertised widely and sold "Budweiser" malt syrup, yeast, and near-beer between 1918 and 1932.

The first issue which arises from these

---

requested by Conrad, "Budweiser Lager Beer," because a decision of the Commissioner "precludes descriptive matter from being embraced as essentially a part of a registrable trade-mark." Conrad thereafter amended his claim to exclude the word "Lager." Then the application was granted.

[4] The Anheuser-Busch Brewing As-

sociation is the predecessor corporation to Anheuser. Although for accuracy this opinion will frequently refer to the Association rather than to Anheuser, it is important to note that, in legal effect, the actions of the Association are those of Anheuser for the purposes of the case at bar.

facts is clear-cut. DuBois says the term "Budweiser" has always been descriptive of the type of beer which has been brewed in the town of Budweis, and that this descriptive name was and is available to anybody who wishes to make beer of the type which originally came from that community; in short, that "Budweiser" is, like "Pilsener," a word not subject to exclusive appropriation. Anheuser, on the other hand, says that "Budweiser" is not now, and never has been, used as the name of a type of beer. As the background outlined above indicates, both the Association (predecessor of Anheuser) and DuBois have taken inconsistent positions in the past, the Association when pressing for the 1886 registration and DuBois when seeking registration in 1905. The trial judge agreed with Anheuser, in a finding which we think is not completely harmonious with other facts he found.[5]

This much, however, does seem beyond dispute: (1) Bohemian beer never contains raw cereal, which is an ingredient of the beer of both Anheuser and DuBois, and (2) the town of Budweis was not shown by either litigant to have even manufactured, much less to have been noted for, products such as near-beer which the parties marketed during the 20's under the "Budweiser" label. Actually, the conclusion is not strained that both Anheuser and DuBois have adopted a name which they deemed advantageous for consumer acceptance of the commodities they were offering for sale, just as they would have sought a Scotch name for tweeds or a French for wines.

Much argument has been directed to this question, whether "Budweiser" is a descriptive word in the sense that nobody can appropriate it to his exclusive use, as was the situation with "Shredded Wheat," Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73; or whether "Budweiser" is a geographical term which may and did acquire a secondary meaning as the product of a particular manufacturer, as the Supreme Court of Pennsylvania found "Dundee" to be in Hartman v. Cohn, 1944, 350 Pa. 41, 38 A.2d 22. As the majority of this court views the facts, the resolving of this interesting question is unnecessary, because Anheuser would be denied injunctive relief here even if "Budweiser" does have a secondary meaning as the product of Anheuser. Consequently, we limit ourselves to the observation that, on the whole, we believe the "Dundee" rationale is that which a Pennsylvania court would apply to this record, on the ground that the record does not sustain the DuBois contention that "Budweiser" in either common parlance or even brewing circles was denominative of a beer which can be prepared and aged only with specific ingredients and according to an undeviable formula. See cases collected at Annotation, 150 A.L.R. 1067.

This brings us to the question whether Anheuser is here entitled to injunctive relief, if it be assumed arguendo that the word "Budweiser" did acquire a secondary meaning as a product of Anheuser. A preliminary problem is whether we refer to Pennsylvania or federal authorities. This court has said that whether an equitable remedy, as contrasted with a judgment at law, is to be granted is a matter for the federal court to decide for itself. See Black & Yates v. Mahogany Ass'n., 3 Cir., 1942, 129 F.2d 227, 233, 148 A.L.R. 841, certiorari denied, Mahogany Ass'n v. Black & Yates, 1942, 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539, and Campbell Soup Co. v. Wentz, 3 Cir., 1948, 172 F.2d 80. On the other hand, the state doctrine of laches was upheld by our decision in Overfield v. Pennroad Corp., 3 Cir., 1944, 146 F.2d 889, an approach which finds support in Guaranty Trust Co. v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231. See Annotation, 148 A.L.R. 139. The problem here, however, is largely academic, as we believe the Pennsylvania and federal decisions are in full accord.

Under both federal and Pennsyl-

---

[5] For example, the district judge found that the purpose of Conrad was that the beer "should be similar in quality, color, flavor, and taste to the 'Budweiser' beer then being made in Bohemia." (Em- phasis added.) 73 F.Supp. at page 343. Also, the trial judge tended to treat "geographic" as being synonomous with "descriptive" in discussing the term.

vania law, it is settled that mere laches on the part of a holder of trade-mark rights would be sufficient to deny him an accounting, but would not necessarily prevent him from obtaining injunctive relief against one guilty of fraudulent infringement of the trade-mark. See Klepser v. Furry, 1927, 289 Pa. 152, 159, 137 A. 175, 177, and McLean v. Fleming, 1877, 96 U.S. 245, 257-258, 24 L.Ed. 828.

The questions, then, are (a) whether "laches" is the most appropriate term which may properly be applied to the inactivity of the Association and Anheuser toward DuBois, and (b) whether DuBois was proved to be guilty of fraudulent conduct. To prevail, Anheuser needs an affirmative answer to both questions. The majority of this court holds against Anheuser on both.

█ (1) *As to the assiduity of Anheuser:* Between 1909 and 1940, without a single manifestation to DuBois of disapproval, and with full knowledge of the use of the word "Budweiser" by DuBois, Anheuser (and the Association) permitted DuBois to continue marketing DuBois Budweiser products. More than that, during the same period Anheuser and the Association did take aggressive action against others employing the term "Budweiser" for their commodities. This court is unanimous in believing that the excuses which Anheuser has given for failure to proceed against DuBois for so long a period of time are patently flimsy and may be rejected in toto.[6] Anheuser (successor to the Association) plainly is guilty of at least inexcusable laches.

The point on which the members of this court disagree is whether the failure of Anheuser to act constituted only laches, or whether the defect is more fundamental and grave. The majority of this court is of the opinion that the conduct of Anheuser falls into the latter category.

█ We may start consideration of this issue with acceptance of the doctrine that a fraudulent infringer cannot expect tender mercy of a court of equity, so that mere delay by the injured party in bringing suit would not bar injunctive relief. This doctrine, however, has its limits; for example, had there been a lapse of a hundred years or more, we think it highly dubious that any court of equity would grant injunctive relief against even a fraudulent infringer. A parallel line of reasoning is to be found in statutes of limitations, prescriptions and adverse possession rules, and the like. If one deliberately trespassing on the land of another and openly claiming it to be his own property can gain title to that land over a specified period of time, we know of no compelling reason why DuBois, known by Anheuser (and the Association) to be openly claiming ownership of the word in defiance of the exclusive right asserted by Anheuser, may not likewise acquire an immunity to legal process by Anheuser on that score.[7] Certainly we have found no case in which injunctive relief was granted after an inexcusable delay for a comparable period of time. See French Republic v. Saratoga Vichy Spring Co., 1903, 191 U.S. 427, 24 S.Ct. 145, 48 L.Ed. 247. In our view, this is not merely a matter of laches; Anheuser has been grossly remiss.

Moreover, we need not rest our decision upon the time factor alone. In two concrete ways Anheuser (and its predecessor Association) has demonstrated that to characterize its behavior as lax would be unduly charitable; the filing of the 1908 complaint against DuBois and the voluntary dismissal shortly thereafter, and the defense of its trademark right against other alleged infringers during the ensuing years. The ability of DuBois to controvert the rights asserted by Anheuser, of course, would be impaired

---

[6] The excuses are: (1) That DuBois did not object in 1909 to discontinuance of the suit, (2) that one of the officers of the Association was ill, and (3) that an era of alcoholic prohibition was imminent and became a reality. We emphasize that none of these factors prevented Anheuser and the Association from taking vigorous and timely action against other users of the word "Budweiser" during that period. As to the

discontinuance of the suit, we might add that few defendants so relish the trial of a suit against them as to oppose a voluntary dismissal of such suit.

[7] A trade-mark is not a right in gross or at large, like a patent or copyright. It is but a means for facilitating the protection of one's good-will. United Drug Co. v. Theodore Rectanus Co., 1918, 248 U.S. 90, 97-98, 39 S.Ct. 48, 63 L.Ed. 141.

with the passage of time and death of some of the key witnesses of DuBois. The conclusion is irresistible that the Association feared the outcome of its 1908 suit,[8] and that the long delay prior to the filing of the instant complaint amounted to at least an acquiescence in use of the word by DuBois, which Anheuser should be estopped to deny at this late hour, if it was not an actual abandonment of the exclusive right as far as DuBois was concerned.

■■ In Procter & Gamble Co. v. J. L. Prescott Co., 3 Cir., 1939, 102 F.2d 773, at page 781, certiorari denied, J. L. Prescott Co. v. Procter & Gamble Co., 308 U.S. 557, 60 S.Ct. 80, 84 L.Ed. 468, this court expressly approved of a statement in Valvoline Oil Co. v. Havoline Oil Co., D.C.S.D. N.Y.1913, 211 F. 189, 195, which we deem particularly apropos to the case at bar: "But it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for and accomplished—especially in a case where the most that can be said is that the trade-mark infringement is a genuinely debatable question."[9] This same principle was recognized by the Supreme Court of Pennsylvania in Consolidated Home Specialties Co. v. Plotkin, 1947, 358 Pa. 14, 30, 55 A.2d 404, 412, when it said, "If the owner of a tradename acquiesces so long in the use of that name or in a name strikingly similar thereto that the public has in general become aware of the other's appropriation of that name and is therefore not deceived, such owner may in a proper case

be treated as having abandoned his one-time property right in that name." See also Prince's Metallic Paint Co. v. Prince Mfg. Co., 3 Cir., 1893, 57 F. 938, 943-944.

We have said that Anheuser should be estopped from asserting its claim to exclusive use of the word "Budweiser." Any doubt whether mere prolonged inaction of the Association and Anheuser would of itself be sufficient to warrant the invoking of this principle is dispelled by the filing and voluntary discontinuance of the 1908 suit against DuBois. If the Association did not want to lull DuBois into a false sense of security, the Association should have followed up the discontinuance of the suit with some unambiguous action asserting its claim against DuBois.

■ We are aware that estoppel of Anheuser depends upon a change of position by DuBois in reliance upon the misleading representation. We think the record does show such change. It is true that the barrel capacity of DuBois has not been enlarged; and obviously DuBois would have a stronger equity if it could show that its total production had been increased. Cf. Procter & Gamble, supra. What is equally clear, however, is that DuBois did spend an appreciable amount of money in advertising its products,[10] and that DuBois Budweiser had a noticeable though minority share of the DuBois output.[11] Within its localized areas of distribution, DuBois assuredly has acquired over the period of years a good will in the name "DuBois Budweiser" which ought not to be eliminated at the instance of a complainant which had led DuBois reasonably to believe that use of the name would not be impugned.

---

[8] In this connection, we note that the 1908 complaint asserted rights under a 1907 trade-mark registration of highly dubious validity, and that the complaint inaccurately intimated that Conrad had coined the term "Budweiser".

[9] While it is true that fraud was not present in the Procter & Gamble case, we note that the infringer did apparently have knowledge of the prior claim in the Valvoline case.

[10] The advertising expenses were $29,783.93 between 1909 and 1919, and $244,836.94 between 1933 and 1945. What part of these sums may be allocated to

DuBois Budweiser is not disclosed by the record.

[11] It has been suggested that DuBois Budweiser attained more success in barrel than in bottle sales, perhaps because it would be easier to pass it off as Anheuser Budweiser. The sales records of DuBois do not bear out this contention. Until 1941, the sales figures fluctuated without a discernible pattern other than that increase in bottled DuBois Budweiser sales was accompanied by decrease in barrel DuBois Budweiser sales, and vice versa. During World War II, both barrel and bottled DuBois Budweiser sales measurably increased.

■ (2) *As to alleged fraud of DuBois:* The court below announced as a conclusion of law that "From the beginning, defendant's use of the words 'Budweiser' and 'Bud' has been with knowledge of the rights of plaintiff and of plaintiff's predecessors, and with the fraudulent purpose and intent of confusing and deceiving the public and of enabling the defendant's product to be passed off as and for the product of plaintiff." Were this conclusion based upon findings of fact not clearly erroneous, this phase of the case at bar would pose no problem on appeal. Upon examination of the record and findings of fact and opinion of the court below, however, serious doubts appear. Close analysis of this conclusion is desirable.

■ (a) As we have already stated, DuBois unquestionably did know of the Budweiser marketed by the Association when DuBois Budweiser was introduced in 1905. Mere knowledge, of course, does not constitute fraud, particularly when the name is being used by a number of other concerns and when the Association (predecessor to Anheuser) has declared in a public proceeding that "no one can have an exclusive right" to the word.

(b) The "fraudulent purpose and intent of confusing and deceiving the public" has not been proved. In the opinion of the court below is included the remark that "one may be pardoned for more than a strong suspicion that the extensive advertising and quality of the Anheuser-Busch 'Budweiser' were not ignored in naming it [DuBois Budweiser]." On the other hand, it is clear that others were using the name as well; that DuBois made no attempt to copy the Association labels; that, in answer to the 1908 bill of complaint, DuBois asserted that the name was in common usage and could not be exclusively appropriated, just as the Association had maintained in 1886; and that the lower court accepted as true the testimony that the president of Du-

Bois had visited Germany and there become familiar with the beer of Budweis. From the foregoing, we would not assert categorically that DuBois remained blissfully ignorant of the possibility that unwary purchasers might buy its product rather than that of the Association; but awareness of the business possibilities of a name is not persuasive proof that the choice of the name was with *fraudulent* intent; i. e., a conscious effort to woo the unsuspecting disciples of the Association products. Although the district judge had "more than a suspicion," he apparently was not prepared, nor are we, to state with assurance that there was fraud in the inception.

■ (c) The question of fraud therefore resolves itself into the sales campaign and methods of the DuBois agents. In general, the representations of DuBois can be classified as (a) "puffing" to which the law attaches no penalty[12] and on which the district court did not rely, and (b) the statement that a customer ordering "Budweiser" could be served the DuBois product. As to the latter, if DuBois reasonably believed it had the right to use the word—and we have found not only that all actions of DuBois have been in conformance with such belief, but also that the Association and Anheuser generously contributed to its reasonableness—such advice is not fraudulent. A different situation would have been presented here if Anheuser had been able to produce convincing evidence that DuBois represented that *DuBois* Budweiser could be served when *Anheuser* Budweiser was ordered. The record certainly establishes that the retailers who were offered the DuBois product knew or were told that it was not the "Budweiser" of Anheuser.[13] Actually, the lower court here has spelled out "fraud" from the fact that the consuming public has experienced some confusion, because of the identity of the name. If tendency to mistake by the public were of itself to constitute fraud, however, fraud

---

12 Into this category fall such remarks as that DuBois Budweiser was the "original", that the right to use the name had been won in the courts, and that the two beers were comparable in quality.

13 We believe no weight can be attached to the fact that the DuBois product was invoiced occasionally as "Budweiser" or "Bud." Such shorthand methods of identification never were intended by DuBois or construed by the purchasers to mean that DuBois was asserting a right to the word "Bud" or that the product of Anheuser was being supplied.

would be present in every case and injunctive relief would never be denied because of laches.

We conclude, therefore, that much more persuasive evidence than was here adduced would be necessary before we should be prepared not only to overlook a course of action of more than thirty years but also to grant injunctive relief.

A number of other issues have been raised by this appeal, but discussion of only one of them is here necessary. As we have indicated, there is ample support in the record for the finding of the district judge that the bottles and labels of DuBois were and are clearly distinguishable from those of Anheuser. This raises the question whether the identity of the trade name would be a sufficient basis for injunctive relief after the lapse of more than thirty years. If federal law be the criterion, this issue appears set at rest by Saxlehner v. Eisner & Mendelson Co., 1900, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60, and French Republic v. Saratoga Vichy Spring Co., supra. In the Saxlehner case, the Supreme Court of the United States did grant an injunction against confusingly similar labels but refused to enjoin the use of the name, when the original user had been guilty of twenty years of inaction and the copying of the labels demonstrated an attempt by the infringer to pass off his product as that of the original user. In the French Republic case, the court likewise refused to enjoin the infringer from using the word "Vichy" because the original user had delayed taking action for thirty years and because the labels were dissimilar. Comparing the prolonged delay, the distinctive labels, and the fragile evidence of fraud in the case at bar with the facts of the Saxlehner and French Republic cases, we think the same result would be demanded if federal law were controlling. Although Pennsylvania courts appear not to have passed upon this particular question, the language hereinbefore quoted from Consolidated Home Specialties Co. v. Plotkin, supra, indicates that, as usual in the law of unfair competition, Pennsylvania would adhere to the federal view. See Gum, Inc. v. Gumakers of America, 3 Cir., 1943, 136 F.2d 957, 960.

Accordingly, we believe that a court of equity should refrain from interfering with the status quo. The parties should be left in the same situation as they were on April 20, 1940, the date of filing of the instant complaint. Anheuser has permitted DuBois to conduct a localized operation over so long a period of time that it would be inequitable to compel DuBois to surrender use of the name at this time. By the same token, DuBois, having confined the sale of its DuBois Budweiser product to localized territory, should not expect to extend its use of that name to other areas with legal impunity.

For the reasons stated, the decree of the lower court will be reversed.

GOODRICH, Circuit Judge (dissenting).

The disagreement among the members of the Court is confined to the point whether the plaintiff has lost its claim to equitable relief because of its laches. Its period of sleeping on its rights nearly doubles Rip Van Winkle's famous siesta. Nor do I find, any more than the majority finds, excuse for the delay either in the fact that the discontinuance of the 1908 lawsuit was with the defendant's consent nor in the fact that the prohibition tide was rising. It is agreed that the plaintiff has shown no excuse for its long delay in suing.

But that is not the end of the story. It is perfectly clear in the Pennsylvania decisions, the federal decisions and the text books that a mere lapse of time is not sufficient to constitute laches.[1] There must be

---

[1] In Klepser v. Furry, 1927, 289 Pa. 152, 159, 137 A. 175, 177, the court said: "In suits for unfair competition or infringement it is well settled that mere laches in the sense of delay to bring suit does not constitute a defense. Such laches may bar an accounting for past profits, but will not bar an injunction against a further continuance of the wrong." See Consolidated Home Specialties Co. v. Plotkin, 1947, 358 Pa. 14, 55 A.2d 404; Juan F. Portuondo Cigar Mfg. Co. v. Vicente Portuondo Cigar Mfg. Co., 1909, 222 Pa. 116, 70 A. 968; Saxlehner v. Eisner & Mendelson Co., 1900, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60; Menendez v. Holt, 1888, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526; McLean v. Fleming

378

something else. We must, therefore, go further in seeing what has happened to the parties during these thirty-five years of delay. The record shows testimony, epitomized in findings of fact, that the plaintiff sold 23,000,000 cases of "Budweiser" near beer from 1920 to 1933. It sold over 21,-000,000 pounds of bulk and canned malt syrup under the "Budweiser" mark. From repeal in 1933 through 1946 the barrel equivalent of the plaintiff's beer sold was 30⅓ million barrels. Since repeal and through 1946, the plaintiff has spent over $25,000,000 in advertising its beer, and the majority of that amount has been spent in advertising "Budweiser" beer. This, and cumulative evidence of a similar sort, adds up to the conclusion that the plaintiff has actively and successfully promoted sales of beer and malt products under the brand of "Budweiser" continuously since 1905 and has attained great success therein.

Defendant's sales prior to prohibition under the label "Budweiser" were small and limited to the northern territory of Pennsylvania and Buffalo, New York. Defendant's brewery was a small brewery and has remained so. Its barrel capacity has not changed since before 1909. Prior to the present suit the beer labeled "DuBois Budweiser" was only a fraction of the total beer this brewery brewed. The figures are as follows: the bottle beer labeled "DuBois Budweiser" ran from less than 8% in 1923 to less than 12% in 1939, while the draught beer sold as "DuBois Budweiser" ran from less than 8% in 1933 to less than 30% in 1939.

I think this evidence is highly significant. It certainly shows that the defendant did not change its position and spend money, relying upon the plaintiff's lack of continuing pressure to stop the use of the name "Budweiser." It shows that the defendant, having jumped on the runners of the plaintiff's bobsled in 1905 has continued to ride

without effort since. There is no element of unfairness, therefore, involved in forcing the defendant to stop the use of the term since he has not spent money or otherwise committed himself. Indeed, it is interesting to note that while the defendant's net sales in 1946 amounted to $1,862,174.16, its advertising expenses were less than $20,000.

In connection with laches the question of defendant's fraud is material. The use of this term has caused confusion through lack of clarity in what is meant by fraud. It is often said that the intentional use of another's trade-mark is a fraud.[2] Then it is said that fraud prevents the operation of the defense of laches.[3] It is quite clear that if these propositions are taken together, without explanation, the defense of laches would not be available except in cases where the defendant had not known that he was using the plaintiff's mark.

I take it that what is really meant in talking about fraud and laches is that if the defendant is using the plaintiff's trademark to secure the substitution of his goods for those of the plaintiff, this type of confusion will make the laches defense unavailable. But it is to be noted that the defendant's bottled beer bears a distinctive label and neither now nor earlier has it been labeled to look like the plaintiff's bottled beer.

But there is further testimony. I agree with the Trial Judge that "Some of it may be subject to the severe criticism visited upon it by defendant's counsel, but not all of it." He points out, in his opinion following the findings of fact, that agents of the defendant seeking retailers as customers, "were likely to, and in some cases have, suggested such substitutions as possible to their proposed customers." The substitutions were substitutions of "DuBois Budweiser" beer for the plaintiff's "Budweiser" when "Budweiser" was called for. Such substitution is hard to effect, except with a very unwary customer, when bottled beer

1877, 96 U.S. 245, 24 L.Ed. 828; 2 Nims, Unfair Competition and Trade-Marks § 409 (4th ed. 1947); 2 Callmann, Unfair Competition and Trade Marks § 87.3 (1945).

[2] Consolidated Home Specialties Co. v. Plotkin, 1947, 358 Pa. 14, 55 A.2d 404;

Menendez v. Holt, 1888, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526.

[3] Saxlehner v. Eisner & Mendelson Co., 1900, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60; See 2 Nims, Unfair Competition and Trade-Marks, § 409 (4th ed. 1947); 2 Callmann, Unfair Competition and Trade Marks § 87.3 (1945).

is called for and when the labels are dissimilar as here. But it is very easy to do in selling draught beer over the bar where taps side by side may say "Budweiser" and "DuBois Budweiser." It would take not only a sober but a very clear visioned and attentive purchaser to tell which he was getting. How much substituting went on, I do not know. There is evidence to show that some of it was encouraged. It may be of some significance to note the increase in defendant's keg "DuBois Budweiser" sales as compared with the increase in bottle sales.

I think, on the whole, that the defense of laches should not prevail despite the long period of delay. No doubt the delay would prevent the plaintiff from getting an accounting and profits, but it has very shrewdly dropped this from its demand. Plaintiff has gone on building up through all the means of modern American advertising the association in the beer drinker's mind of the "Budweiser" name and Anheuser-Busch beer. The defendant has simply followed along and, in a limited area, siphoned off a small amount of the business which the plaintiff had thus built up. Defendant has made no commitments which make relief against it harsh or inequitable, and people who work for defendant have created at least opportunity for fraud upon the beer buying public.

I should affirm.