**A. E. STALEY MANUFACTURING COM-PANY, Plaintiff-Appellee,**

v.

**STALEY MILLING COMPANY, Defendant-Appellant.**

**No. 11514.**

United States Court of Appeals
Seventh Circuit.

March 13, 1958.

Percy E. Williamson, Jr., New York City, Montgomery S. Winning, Giffin, Winning, Lindner & Newkirk, Springfield, Ill., Wallace H. Martin, Robert Bonynge, Oliver P. Howes, Jr., Nims, Martin, Halliday, Whitman & Williamson, New York City, of counsel, for defendant-appellant.

Thomas W. Samuels, Decatur, Ill., William T. Woodson, Chicago, Ill., Le Forgee, Samuels & Miller, Decatur, Ill., Woodson, Pattishall & Garner, Chicago, Ill., Carl R. Miller, Decatur, Ill., of counsel, for plaintiff-appellee.

Before FINNEGAN, SCHNACKENBERG and PARKINSON, Circuit Judges.

FINNEGAN, Circuit Judge.

A factual controversy is the chief factor in this appeal resting upon a prolix record. After carefully canvassing that five volume transcript of evidence containing roughly 3693 printed

pages encompassing testimony of 122 witnesses, 192 depositions and a welter of exhibits, it is our opinion that the findings of fact, vigorously assailed by defendant, and entered below, must be left undisturbed. This is simply not an instance of where some critical finding, or findings, of fact are clearly erroneous. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; United States v. Oregon State Medical Soc., 1952, 343 U.S. 326, 339, 72 S.Ct. 690, 96 L.Ed. 978. Defendant's minute dissection of various findings of fact in the hope of exhibiting deficiencies which would persuade us that the judgment below was the result of the trial judge's unwarranted and unsound diagnosis of the evidence is unavailing when measured by the record and Rule 52, Federal Rules Civil Procédure, 28 U.S.C.: "In all actions tried upon the facts without a jury * * * the court shall find the facts specially and state separately its conclusions of law thereon * * *. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * * If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. * * * *"

What Judge Lindley, speaking for the panel which heard and decided Benrose Fabrics Corp. v. Rosenstein, 7 Cir., 1950, 183 F.2d 355, 358 cogently summarized has an acute application in the case now before us:

"From the foregoing facts and certain others, some controverted and some undisputed, with which it is unnecessary to belabor this opinion, it seems clear to us that the evidence was of such character and weight as to support the findings and conclusions. We can conceive of no right upon our part to set them aside, for we cannot say, as a matter of law, that they are clearly erroneous. True, with other courts, we have announced that if findings rest upon documents, depositions or upon mere comparison of names, if credibility of witnesses is not involved, or if the trial tribunal has no opportunity to observe the witnesses, a court of review is as well qualified to pass upon the weight of evidence as is the trial court, but where, as here, conflicting stories are told by witnesses whose credibility is at stake, we may not supersede the determination of the finder of fact and substitute our judgment for his. It is not a question of whether we would have made the same finding; it is rather a question of whether the evidence substantially and adequately supports it."

Our court, in Norwich Union Indemnity Co. v. Haas, 7 Cir., 1950, 179 F.2d 827, 832 laid down these general principles also relevant here:

"We have considered plaintiff's contention that the findings of the District Court are insufficient. It must be remembered that Rule 52 of Federal Rules of Civil Procedure does not require the trial court to make findings on all the facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient. * * * *"

The Tenth Circuit expressed a similar view in Trentman v. City and County of Denver, Colo., 1956, 236 F.2d 951, 953. We hold that the findings before us in this appeal sufficiently disclose the factual basis for the trial judge's ultimate conclusions. The record contains substantial support for those findings of fact. O'Brien v. O'Brien, 7 Cir., 1953, 202 F.2d 254, 255, Woods v. Oak Park Chateau Corporation, 7 Cir., 1950, 179 F.2d 611. A mature system of law manifests recognition that absolute certainty concerning questions of fact cannot repeatedly be attained in trials of this sort. When practical men investigate the question whether purchasers of trade-marked articles are likely to be confused or mistaken as to the source of

origin of such goods, the resulting answer is unlikely to be any more than a probability. To be sure the probabilities can be improved, as we point up elsewhere in our opinion. But on the evidence before us the trial judge could only arrive at his conclusions through inductive reasoning; that is by examining the testimonial instances of customer confusion.

Among the "contested issues" stated in defendant's opening brief is this key one and, its derivative aspects. "1. Whether defendant has infringed trademark rights of plaintiff in the surname 'Staley.' A. Whether plaintiff has acquired the exclusive right to use the surname 'Staley' as a trademark for all human foods and all animal feeds prior to defendant's adoption and use of the surname 'Staley' as its trademark for certain food and feed products. B. Whether defendant has used the surname 'Staley' unfairly and in a manner calculated to pass its products as products of plaintiff." Of course, those quoted lines constitute defendant's version of a major question in the case, and may be fairly assumed to be the critical issue in support of which plaintiff had the burden of producing evidence.

After two months of trial in the district court the following findings of fact, among others, were entered:

8. Neither J. H. Staley nor any member of his family had ever made or sold any product under the trade-mark Staley or Staley's prior to the date of defendant's incorporation in 1925.

9. Plaintiff's business is the processing of corn and soybeans and the manufacture and sale of a variety of products derived therefrom, including food and animal feeds, and the sale of whole grains.

10. In 1912, plaintiff began the manufacture, advertising and sale of food and feeds under the trade-mark Staley's and has continuously manufactured, advertised and sold its principal foods and feeds under the trade-mark Staley's since that date.

11. The bags and containers in which plaintiff's feeds have been sold have always had printed thereon the trade-mark Staley's or, if sold in plain bags, have had tags attached thereto bearing said trade-mark.

12. Plaintiff's trade-mark Staley's is generally displayed with a tail on the letter "Y" extending under the other letters of the name, commonly called a paraph. Plaintiff's first use of the paraph was prior to 1921. Plaintiff's first registration of the trade-mark Staley's in 1921 contained the paraph.

13. Since 1912, plaintiff has also used as a trade-mark on its feeds a target or disk design. This trade-mark was registered by plaintiff in 1926.

14. In 1922, plaintiff began processing soybeans and began the production and sale of the products derived therefrom, including foods for human consumption and animal feeds.

15. In 1925, plaintiff began the sale of whole grains, including corn, wheat and oats, under the trade-mark Staley's. Some of these whole grains were sold for livestock feeding.

16. Plaintiff's use of Staley's as a trade-mark for food for human consumption and for animal feeds was long prior to defendant's use of Staley as a trademark.

17. When defendant was founded in 1925, under the corporate name Staley Milling Company, plaintiff was using Staley's as a trade-mark for foods and feeds on a national scale.

18. Plaintiff has obtained and now owns fifteen registrations of the trademark Staley's in various combinations in the United States Patent Office for its various products including food for human consumption and animal feeds, the first of which was obtained in 1921.

19. Plaintiff has obtained seventeen registrations in the United States Patent Office of trade-marks which include the syllable "Sta", one of which is Stavite, the first of which was obtained in 1926.

20. Defendant has never used any trade-marks other then [sic] Staley which included the syllable "Sta".

21. Defendant, in 1937, registered a mark containing the words "Staley's Record", a part of which it abandoned in 1946.

22. Defendant's first trade-mark for feeds was Four Bells, which it registered in the United States Patent Office in 1925.

23. In addition to the mark "Staleys" Defendant uses various trade-marks for foods and feeds, among which are Four Bells, Pig Mama, Pro-Lass, Hog Uncles, Shur Gain, Dr. Pig, Royal Scot, Blessed Event, Atoms, Drykow, and Alpurpus.

24. From 1912 through 1950, (the last full calendar year before this suit was filed) plaintiff sold its feeds under the trade-mark, Staley's.

25. From 1912 through 1950, plaintiff's sales of products manufactured from corn and soybean were in excess of 34,000,000,000 pounds, having a value in excess of $1,400,000,000.

26. From 1912 through 1950, plaintiff's feed sales amounted to more than 17,400,000,000 pounds, having a value in excess of $330,000,000.

27. From 1912 through 1950, plaintiff sold in excess of 1,500,000,000 pounds of whole grains.

28. From 1924 through 1950, plaintiff expended in excess of $10,400,000 in advertising its various products, including feeds, most of which were advertised and sold under its trade-mark Staley's, and plaintiff also expended large sums of money in sampling and other forms of promotion in the introduction and sale of its various products, including feeds, under its trade-mark Staley's. Plaintiff has no records of any advertising expenditures prior to 1924.

29. Plaintiff's feeds are and have been at all pertinent times sold and distributed through retail feed dealers for resale to farmers, ranchers and feeders, and are also sold to feed manufacturers.

30. The trade-mark Staley's has identified and has been distinctive of plaintiff's products, both food and feeds, in commerce to the trade and public since 1912.

31. In advertising and selling products from grain, such as starches and syrups, under the trade-mark Staley's, plaintiff has created a widespread secondary meaning for Staley's in connection with grain products generally, including feeds.

32. For many years plaintiff has been, and now is, well and favorably known troughout [sic] the United States as a producer of reliable and meritorious products from corn and soybeans advertised and sold under the trade-mark Staley's.

33. Plaintiff has long been known and commonly referred to as "Staley" or "Staley's" by the trade and general public.

34. Plaintiff has built up, and now has, a large and valuable business in the manufacture and sale of corn and soybean products, including food and feeds, which are identified by the trade-mark Staley's, aggregating many millions of dollars annually, and plaintiff thereby has a valuable good will in said trademark.

35. Defendant is engaged in the processing of corn and the manufacture and sale of food for human consumption and feeds for livestock and poultry, most of which are sold and advertised under the trade-mark Staley.

36. Defendant's feeds are sold and distributed through retail feed dealers for resale to farmers, ranchers and feeders, and are also sold to feed manufacturers.

37. Defendant originally sold its feeds under the trade-mark Four Bells but by a gradual process came to use the name Staley and Staley Feeds on its bags in a fashion very similar to plaintiff's use of the trade-mark Staley's on feeds.

The gradual process consisted of moving the words Staley Milling Company to a position above 4 Bells; then later, instead of using Staley Milling Company

above 4 Bells, using Staley alone in script; then later using Staley with a paraph; then using Staley with a paraph and in logotype similar to the paraph and logotype used by plaintiff in its trademark Staley's; and then later, by adding a red disk design in some respects similar to the disk or target design used by plaintiff and using it as a background for Staley on its bags and containers. These changes took place between the years 1925 and 1946.

38. It does not appear that plaintiff knew of or acquiesced in any of these changes.

39. During the period in which these changes were made, defendant subordinated its corporate name while giving increased prominence to Staley as a trade-mark.

40. In 1949, defendant applied for a license to do business in the State of Illinois. About this time, defendant distributed fans at the Illinois State Fair and placed road signs within a radius of forty miles of plaintiff's plant each bearing the words Staley Feeds, without displaying its corporate name thereon.

41. Defendant's use of Staley and Staley's on and in connection with its products has constituted a "progressive encroachment" upon plaintiff's use of and rights in the trade-mark Staley's.

42. At least as early as 1934, defendant had actual notice of plaintiff's use of Staley's as a trade-mark for feeds.

43. It was in 1934 that defendant began buying plaintiff's feed in bags bearing the trade-mark Staley's at the top of the bag and bearing the red target or disk design.

44. Defendant's expenditures and investments since 1934 have been made with full knowledge that plaintiff was using the trade-mark Staley's on feeds.

45. Plaintiff's first knowledge of the wide extent of defendant's use of Staley or Staley's as a trade-mark for its products was in 1949 shortly after defendant sought plaintiff's consent to qualify to do business in the State of Illinois, at which time plaintiff objected to said use.

46. Defendant's operations were small in the early years.

47. In later years, its sales were concentrated largely in Kansas and Missouri.

48. The evidence does not disclose that plaintiff has ever purchased any of defendant's products.

49. Defendant's invasion of plaintiff's field was of a gradual or progressive character.

50. Plaintiff's relationship with defendant for several years, including the sale of soybean oil meal to defendant, was not sufficient to charge plaintiff with notice of defendant's use of the trademark Staley or Staley's.

51. Plaintiff, when it sold soybean oil meal to defendant, was not chargeable with notice that defendant was using Staley as a trade-mark on any of its products.

52. Substantially one half of defendant's total advertising expenditures were made after plaintiff's objection to defendant's use of Staley as a trade-mark in 1949.

53. A large part of defendant's total advertising expenditures were incurred after this suit was filed in 1951.

54. Plaintiff never consented to defendant's use of Staley as a trade-mark.

55. Defendant, in adopting and using the trade-mark Staley, did not reply [sic] on any act or omission of plaintiff.

56. Plaintiff's feed products are and always have been in the same field and competitive with defendant's feed products, notwithstanding the fact that a large part of plaintiff's feed products have been sold without the mixing of ingredients and a large part of defendant's feed products have been sold after the mixing of ingredients.

57. Both parties are in many respects in the same business.

58. Both parties have processed and do process corn.

59. Both parties have made and do make food products for human consumption from corn.

60. Both parties have sold and do sell food products to wholesale and retail grocers.

61. Both parties have made and do make brewers grits.

62. Both parties have made and do make corn oil.

63. Both parties have made and do make feeds for livestock and poultry.

64. Both parties have made and do make feed containing but a single ingredient.

65. Both parties have made and do make multi-ingredient feeds.

66. Both parties have made and do make feeds which are fed "straight", that is, in the form in which the feeds are made and without being supplemented by or mixed with other feeds.

67. Both parties have made and do make feeds which are fed as supplements to other feeds.

68. Both parties have sold and do sell whole grains.

69. Both parties have made and do make feeds used as ingredients in other feeds.

70. The respective customers of both parties have used and do use the respective feeds of both parties for custom mixing.

71. Both parties have made and do make feeds to meet special nutritional needs.

72. Both parties have sold and do sell feeds to ranchers and farmers for mixing with other feedstuffs, and also to feed manufacturers.

73. Both parties have sold and do sell feeds to dealers for sale to farmers, feeders and ranchers.

74. The feeds of both parties have been sold and are sold in retail feed stores.

75. Both parties have sold and do sell their feeds in bags or sacks.

76. Both parties have sold and do sell their feeds in bulk.

77. Both parties have sold and do sell their feeds in printed bags.

78. Both parties have sold and do sell their feeds in plain bags with tags attached.

79. The feeds of both parties have been and are fed by farmers and feeders in self-feeders along with homegrown grain.

80. Both parties have advertised and do advertise their feeds in farm newspapers, farm journals, and by circulars, direct mail and point-of-sale posters and placards.

81. Both parties compete in the sale of their feeds for the farmer's dollar.

82. When plaintiff began the manufacture of feeds in 1912, most feeds purchased by farmers were unmixed or single-ingredient feeds. In recent years, the trend has been to multiple-ingredient feeds, and plaintiff expanded its line of feeds to include more of such multiple-ingredient feeds.

83. The feeds of both parties are subject to registration and to inspection by the Departments of Agriculture of the respective states in which they are sold.

84. The feeds of both parties have been progressively developed and improved.

85. Both parties have from time to time expanded their line of feeds.

86. The use by defendant of the trade-mark Staley on foods and feeds has caused confusion and mistake and has deceived purchasers as to the source of origin of such products.

87. Farmers and feeders have bought defendant's feeds believing them to be plaintiff's feeds.

88. Dealers have handled defendant's feeds believing them to be plaintiff's feeds.

89. It is frequently assumed by the trade and public that plaintiff and defendant are either identical or that defendant is a subsidiary of plaintiff or that defendant's plant in Kansas City, Missouri, is a branch plant of plaintiff or that defendant and plaintiff are in some manner connected or affiliated.

90. Feeds, whether mixed or unmixed, are products which the public naturally expects a processor of corn and soybeans to produce.

91. The use by defendant of the trade-mark Staley on foods and feeds is likely to cause confusion and mistake and to deceive purchasers and potential purchasers as to the source of origin of such products.

92. The use by defendant of other trade-marks, such as 4 Bells and Pig Mama, along with Staley does not distinguish defendant's products from plaintiff's products sold under the trade-mark Staley's.

93. The use of the identical trade-mark Staley by both parties on kindred products is inevitably and necessarily deceptive and confusing.

94. The natural and probable result of defendant's use of the trade-mark Staley was to lead the public to purchase defendant's goods in the belief that they were the goods of plaintiff.

95. Such specific differences as may exist between the goods of the parties hereto are not sufficient to prevent confusion of the trade and public when Staley and Staley's are used as trade-marks on or in connection with such goods.

96. The use by defendant of the identical trade-mark Staley on its products indicates an intent to appropriate plaintiff's good will in its trade-mark and to use it unfairly in competition with plaintiff.

97. Plaintiff is the rightful owner of the name Staley's as a trade-mark for food for human consumption and for livestock and poultry feeds and is entitled to the exclusive use of said trade-mark for said products.

98. There is no evidence of any third-party usage of Staley or Staley's as a trade-mark, or part of a trade name, for food or feeds.

99. Defendant's infringement of plaintiff's trade-mark rights was intentional, progressive and wrongful.

100. There is a public interest involved in this action.

101. The public has an interest in being protected against confusion and likelihood of confusion, caused by defendant's use of Staley as a trade-mark for foods and feeds.

Our alertness to the social values in and functions of trademarks flows from and parallels the dual purposes of the trademark statute recognized by the Congressional Committees, who reported on the Lanham Trade-Mark Act July 5, 1946, 60 Stat. 427, 15 U.S.C.A. §§ 1051–1057: "The purpose underlying any trade-mark statute is twofold. One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats. This is the well-established rule of law protecting both the public and the trade-mark owner. * * *" U.S.Code Cong. Service, 1274 (1946).

Congress, through legislation now familiarly known as the Lanham Act, supplied a remedy and provided, *inter alia:*

"Sec. 32. (1) Any person who shall, in commerce, (a) use, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of any registered mark in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use *is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services;* or (b) reproduce, counterfeit, copy, or colorably imitate any such mark and apply such reproduction, counterfeit, copy, or colorable imitation of labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to

be used upon or in connection with the sale in commerce of such goods or services, shall be liable to a civil action by the registrant for any or all of the remedies hereinafter provided * * * [referring to subsequent sections, and for example, injunctive relief.]" (Italics supplied) 15 U.S.C.A. § 1114.

For roughly 18 years defendant sold some of its products to the plaintiff and during that period (as well as before) "Staley" was, and for that matter still is, an integral part of their respective corporate names. In the beginning defendant used the trademark "Four Bells" on its feeds and as time ran on the name "Staley" and "Staley's Feeds" moved into focus on defendant's containers. When plaintiff commenced this action, defendant responded with the defense of estoppel and a counterclaim alleging that the two corporations had always been in separate fields. That is, defendant mentally sorts out its business and plaintiff's by simply saying the latter was in the business of processing corn and soybeans from which plaintiff produced starches, syrups, oils, and "certain by-products primarily sold as ingredients to manufacturers of mixed feeds." On the other hand, defendant has always manufactured and sold mixed feeds or formula feeds. But defendant's reasoning runs afoul of the Lanham Act and the theories discussed in cases such as Pure Foods v. Minute Maid Corp., 5 Cir., 1954, 214 F.2d 792, 796, where the Fifth Circuit reports that the Act adopts principles stated in ALI Restatement of the Law of Torts, Vol. 3, § 730.

We think the trial court penetrated the superficialities of defendant's position on the nature of the businesses and goods of these litigants, during the course of his "Memorandum," when he observed:

"It has seemed to me that the decision here must turn largely upon whether Plaintiff and Defendant, in their respective feed lines, are in the same or separate fields. If they are in the same field then Plaintiff was the first to adopt and use the name 'Staley' as a trade-mark and Defendant's use should be enjoined unless Plaintiff by its conduct is estopped to challenge defendant's use. If they are in separate fields then defendant is entitled to the use of the name for its mixed feeds and Plaintiff's use should be enjoined as to mixed or formula feeds.

"The Conclusion I have reached on this question is that the 'separate fields' theory is too tenuous a one to be adopted by the Court. It would require too fine a distinction to hold that because a large part of Plaintiff's feed products were sold without the mixing of ingredients and a large part of defendant's feed products were sold after the mixing of ingredients that they thus became and were in different fields and noncompetitive. While in the beginning of its corporate existence Plaintiff's principal products were starches and syrups, it early began the manufacture and sale of feeds for livestock and poultry, and in my judgment has been in a competitive field with defendant since defendants incorporation in 1925."

Grounding its amended complaint, filed November 27, 1951, on the Act, plaintiff sought to enjoin the defendant from using Staley or Staley's and a target or disk design as trademarks for food for human consumption and for stock feeds. Both parties in this trademark and unfair competition suit claim the right to and exclusive use of the name and trademark "Staley" in connection with mixed feeds for livestock and poultry. A. E. Staley Manufacturing Company, of Decatur, Illinois, the plaintiff, was founded by, and incorporated in 1906, by A. E. Staley. Defendant Staley Milling Company, a Missouri corporation, was incorporated in 1925 and L. H. Staley (unrelated to A. E. Staley) was one of its incorporators. Plaintiff holds: (a) fifteen federal registrations of its trademark Staley's for various products, including food for human consumption

and animal feeds, the first of which was obtained in 1921; (b) seventeen federal registrations of trademarks which include the syllable "STA," for various products, the first of which was obtained in 1926; and (c) registration of its target or disk design for stock feed, obtained in 1926. Here again, there are several relevant provisions in the Act:

"Sec. 33. (a) Any certificate of registration issued under the Act of March 3, 1881, or the Act of February 20, 1905, or of a mark registered on the principal register provided by this Act and owned by a party to an action shall be admissible in evidence and shall be *prima facie* evidence of registrant's exclusive right to use the registered mark in commerce on the goods or services specified in the certificate subject to any conditions or limitations stated therein, but shall not preclude an opposing party from proving any legal or equitable defense or defect which might have been asserted if such mark had not been registered.

"(b) If the right to use the registered mark has become incontestable under section 15 hereof, the certificate shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate subject to any conditions or limitations stated therein except when one of the following defenses or defects is established: * * *

"(3) That the registered mark has been assigned and is being used, by or with the permission of the assignee, so as to misrepresent the source of the goods or services in connection with which the mark is used; or

"(4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of any used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin; or

"(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to the publication of the registered mark under subsection (a) or (c) of section 12 of this Act: *Provided, however,* That this defense or defect shall apply only for the area in which such continuous prior use is proved.

"(6) That the mark whose use is charged as an infringement was registered and used prior to the publication under subsection (a) or (c) of section 12 of this Act of the registered mark of the registrant, and not abandoned: *Provided, however,* That this defense or defect shall apply only where the said mark has been published pursuant to subsection (c) of section 12 and shall apply only for the area in which the mark was used prior to the date of publication of the registrant's mark under subsection (a) or (c) of section 12 of this Act. * * * *"

The counter claim was dismissed, no accounting was decreed, defendant was not enjoined from using the target or disk design, both parties are permitted to continue use of their respective corporate names, and the extent of the restraint imposed on defendant is as follows:

"1. That the defendant, its officers, agents, servants, employees, successors, and assigns, and all persons holding or acting by, through, or under it, be and the same are hereby perpetually enjoined and restrained from:

"(a) Using the name Staley or Staley's or Staley Feeds or Staley's Feeds as a trade-mark for food for human consumption or for livestock or poultry

feeds or from using a colorable imitation thereof.

"(b) Emphasizing the name Staley over the other words of defendant's corporate name.

"(c) Doing any act or thing likely to confuse the public in relation to the identity of plaintiff's and defendant's products."

Several conclusions of law were entered below and among them are these: "27. Defendant's use of Staley as a trade-mark for its product constitutes an infringement of plaintiff's common law and federally registered trade-mark Staley's; 28. Defendant's use of Staley or Staley's as a trade-mark constitutes unfair competition with plaintiff."

■ "The ultimate determination of consumer confusion is a question of fact," G. D. Searle & Co. v. Chas. Pfizer & Co., 7 Cir., 1956, 231 F.2d 316, 318. Confronted with the statutory words "likely to cause confusion" in § 32, defendant, in its reply brief, at pp. 15–16 tells us: "Defendant does not contest the proposition that likelihood of confusion is the test of infringement in ordinary cases such as those cited by plaintiff, from which the essential elements of the present case are absent." What seems to make this case extraordinary according to the defendant is that: (1) for 26 years plaintiff was unaware of such confusion, (2) the testimony of witnesses regarding confusion lacked probative value and, (3) defendant's survey of 1,-084 farmers was ignored by the trial judge. But it is our considered judgment that both plaintiff and defendant have understated, overstated, and misstated the evidence traced on this record. Neither side conducted a survey which could be classed as scientific under modern statistical methodology. Though the technical field of statistical surveys by the sampling method was undiscussed in the briefs before us, the subject is hardly an obscure one. For example see Barksdale, The Use Of Survey Research Findings As Legal Evidence (1957); Deming, Some Theory Of Sampling (1950); Deming, On The Contributions Of Standards Of Sampling To Legal Evidence And Accounting, Current Business Studies 14–32 (Oct.1954); Public Opinion Surveys As Evidence: The Pollsters Go To Court, 66 Harv.L.Rev. 498 (1953); Sylvester, Consumer Polls As Evidence In Unfair Trade Cases, 20 Geo.Wash.L. Rev. 211 (1951); Waterbury, Opinion Surveys In Civil Litigation, 44 Trade Mark Reporter 343 (1954). "It may well be that an accurate estimate of public opinion or practice can be obtained by a sampling process or survey, but the record is devoid of information on this subject and in the absence of the proof of the scientific principles, if any, which underlie the practice, we must rely upon the impressions which the advertisements would be likely to make upon the mind of a man of ordinary intelligence." Bristol-Myers Co. v. Federal Trade Commission, 4 Cir., 1950, 185 F.2d 58, 60. Sears, Roebuck and Co. v. Johnson, 3 Cir., 1955, 219 F.2d 590, United States v. 88 Cases, etc., 3 Cir., 1951, 187 F.2d 967; Household Finance Corporation v. Federal Finance Corporation, D.C.Ariz. 1952, 105 F.Supp. 164 discussed in 1953, 17 J. Marketing 289, International Milling Co. v. Robin Hood Popcorn Co., 1956, 110 U.S.P.Q. 368, S. C. Johnson & Co., Inc. v. Gold Seal Co., 1950, 40 T.M.Rep. 349.

■ To maintain its burden of proof on the issue of confusion or likelihood of confusion plaintiff and defendant offered testimony of numerous purchasers and prospective purchasers. Indeed this class of evidence accounts for the bulk of the record. The short of all this is that defendant contends its consumer witnesses outweigh those of plaintiff, in quality and quantity. Yet elementary as it is we again point out that weight and credibility are matters for the district judge trying a case without a jury. Even though some of the evidence was introduced through depositions we found nothing in them impelling a different view of the facts than the one taken below. Square D-Company v. Sorenson, 7 Cir., 1955, 224 F.2d 61.

Our own observations of the numerous sacks, signs and bags brought here as exhibits, verified the district judge's conclusions on the issue of "confusion." Only the most discerning, discriminating and determined customer, among brand conscious consumers, could avert mistaking Missouri Staley for Illinois Staley among the products involved. Defendant's own thesis about its heavy advertising expenditures demonstrates the extensive saturation of consumers with virulent confusion of trademarks. It is unnecessary, and costly, to reproduce the myriad cuts and photographs forming part of the record, lurking in the briefs and bound separately as books of exhibits.

What Mr. Justice Frankfurter wrote in the majority opinion of a divided court, reported as Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 1942, 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381, has particular significance in the case before us, though written about fifteen years ago, for it epitomizes the legal rationale underlying trademark legislation:

"The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress. * * *"

Only a word or two need be said when rejecting defendant's arguments concerning its defense of estoppel for we think the trial judge's Memorandum, quoted here in relevant part, disclosed a sound grasp and clear view of this case:

"While it may be thought that Plaintiff's relationship with Defendant for several years, including the sale of soy bean oil meal to Defendant, was sufficient to charge the Plaintiff with notice of Defendant's use of the trade mark in question, yet the Defendant's operations were small in the earlier years, and its invasion of the field claimed by Plaintiff for its mark was of such a gradual or progressive character that I am inclined to the view that Plaintiff should not be barred from injunctive relief by reason of laches or by virtue of estoppel. I am of the opinion, however, that Plaintiff is not entitled to an accounting, but a public interest exists that should be protected—a right of the public not to be confronted on all sides with confusion or the likelihood thereof."

We would add Mr. Justice Stone's admonition from Scott Paper Co. v. Marcalus Co., 1945, 326 U.S. 249, 257, 66 S. Ct. 101, 105, 90 L.Ed. 47: "For no more than private contract can estoppel be the means of successfully avoiding the requirements of legislation enacted for the protection of a public interest." Also see Independent Nail & Packing Co. v. Stronghold Screw Prod., Inc., 7 Cir., 1953, 205 F.2d 921. The elements of estoppel, absent here, are itemized in Parker v. Sager, 1949, 85 U.S.App.D.C. 4, 174 F.2d 657, 660.

Independent Nail & Packing Co. v. Stronghold Screw Prod., Inc., 7 Cir., 1953, 205 F.2d 921 is heavily relied upon by plaintiff and defendant thinks it inapposite, consequently irrelevant. Both sides apparently overlooked this court's subsequent opinions in the same case. In the opinion reported as Independent Nail & Packing Co. v. Perry, 7 Cir., 1954, 214 F.2d 670, 671, when our court

issued a writ of mandamus directed to the trial court, Judge Duffy described the initial Independent Nail & Packing Co. case, stressing the fact that: "In 1946, which was twelve years after plaintiff had widely advertised its products under the trade-mark, 'Stronghold,' defendant changed its corporate name to Stronghold Screw, Inc.," and quoting from the first opinion, our Chief Judge also stated: "Defendant adopted its logotype emphasizing the word 'Stronghold' with full knowledge of plaintiff's trade-mark which featured the same word. It did so at its peril." (214 F.2d 670, 671; 205 F.2d 921, 925). When the second appeal came before our court, Chief Judge Duffy again wrote the opinion reported as Independent Nail & Packing Co. v. Stronghold Screw Prod., 7 Cir., 1954, 215 F.2d 434, 436 in which the following cites and quotes appear:

"In Northam Warren Corp v. Universal Cosmetic Co., 7 Cir., 18 F.2d 774, this court said, at page 775: 'One entering a field of endeavor already occupied by another should, in the selection of a trade-name or trade-mark, keep far enough away to avoid all possible confusion.' In Weiner v. National Tinsel Mfg. Co., D.C., 35 F.Supp. 771, 772, the court said: 'The late comer in such an established field is under a special duty to avoid confusion.' This court also said in the Northam Warren opinion, supra: 'Whether there is an infringement of a trade-mark does not depend upon the use of identical words, nor on the question as to whether they are so similar that a person looking at one would be deceived into the belief that it was the other; but it is sufficient if one adopts a trade-name or a trade-mark so like another in form, spelling, or sound that one, with a not very definite or clear recollection

as to the real trade-mark, is likely to become confused or misled.' "

One of the critical factors in the case now before us for decision might be cast in terms of who is the late-comer, plaintiff or defendant, in the feed field. "Staley" is the first name in the legal corporate name of each litigant, as we have already mentioned. But the district judge found as a fact that "Plaintiff's use of Staley's as a trade-mark for human consumption and for animal feeds was long prior to defendant's use of Staley as a trade-mark." Defendant is, then, the late-comer and what we have pointed up from our opinion in Northam Warren Corp., supra, again has pertinency. Indeed in his testimony, Thomas W. Staley, defendant's treasurer, general manager and assistant secretary, said *inter alia*:

"Mr. Miller: Q. Now, up until the time you started using the name Staley on hog and pig feeds in 1934, you had sold those feeds under the brand name 4 Bells, hadn't you? A. Well, we show in our answers and these were checked as carefully as possible, pig and hog feed sold under the 4 Bells trademark in 1925 to about 1930. And we show pig and hog feeds sold under the name Shurgain at least as early as 1927.

"Q. Those were the only trademarks you used prior to 1934 when you adopted Staley's, were they not?

"Mr. Martin: For what product?

"Mr. Miller: Pig and hog feed.

"The Witness: Excepting as we used our corporate name as a part of our label."

Defendant's legal position did not improve when we examined all the other points discussed in its briefs. The result is that the judgment appealed must be affirmed.

Judgment affirmed.