**THE SEVEN-UP COMPANY, a corporation, Plaintiff,**

**v.**

**O-SO GRAPE CO., Bubble Up Corporation, and Bubble Up International, Ltd., corporations, Defendants.**

**No. P-2217.**

United States District Court
S. D. Illinois, N. D.

Sept. 30, 1959.

---

13.  12 P.S. § 31.

14.  15 U.S.C.A. § 15b.

Woodson, Pattishall & Garner, Chicago, Ill., for plaintiff.

Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill., Eugene R. Johnson, Miller, Westervelt & Johnson, Peoria, Ill., for defendants.

MERCER, Chief Judge.

By its complaint in this cause, filed March 20, 1959, plaintiff, The Seven-Up

Company, prays injunctive relief and an accounting by defendants for profits growing out of alleged infringement of plaintiff's trade-mark "7 Up" and alleged unfair competition. In summary, the complaint alleges: Since 1928 plaintiff has used its registered trade-marks "7 Up" and also "Seven Up", in the marketing and exploitation of a soft drink; that plaintiff has expended large sums of money in advertising, marketing and promoting the sale and public acceptance of its product under the "7 Up" trade-mark; that plaintiff has achieved a general public acceptance of its product and a valuable good-will, both of which are symbolized by its said trade-mark; and that, at a date subsequent to plaintiff's adoption and registration of its said trade-marks, defendants have commenced the manufacturing and marketing of a soft drink of a flavor and type similar to plaintiff's product under the trade-mark "Bubble Up." It is further alleged that defendants' "Bubble Up" trade-mark is invalid and that defendants' use of that mark constitutes an infringement of plaintiff's "7 Up" mark and unfair competition.

Defendants answered, denying the material allegations of the complaint and averring, inter alia, the affirmative defense of laches as a bar to plaintiff's claims. The cause is now before the court upon defendants' motion under Rule 42(b), F.R.Civ.P., 28 U.S.C.A., for a separate trial of the issue of laches in advance of trial of other issues in the cause.

The court is vested with a large discretion to order a separate trial of any issue in a pending suit "in furtherance of convenience or to avoid prejudice", Rule 42(b), the exercise of which is unassailable in the absence of a clear abuse of discretion. Chicago, R. I. & P. R. Co. v. Williams, 8 Cir., 245 F.2d 397; Bowie v. Sorrell, 4 Cir., 209 F.2d 49, 43 A.L.R.2d 781; Shippers Pre-Cooling Service v. Macks, 5 Cir., 181 F.2d 510; See, to same effect, Meyercheck v. Givens, 7 Cir., 180 F.2d 221, 223. By its nature, this case is one peculiarly susceptible to the separation of its several issues for trial. Defendants aver that the proof on their defense of laches will be largely documentary evidence which will be uncontested. They estimate that that issue could be completely disposed of in one or two trial days, and they contend that a finding of laches against plaintiff would operate to dispose of all other issues in the case. That estimate of economy in time appeals to the court if it appears likely that a decision on the laches issue in favor of defendants would probably be decisive of all issues in the case. It is to be anticipated that trial of the case, ensemble, would require a number of trial days. The court is not disposed to order a separate trial of the issues, however, unless it is to be reasonably anticipated that disposition of the laches issue in defendants' favor would place this litigation at rest.

Whether or not the latter result would be anticipated to follow a resolution of the laches issue in defendants' favor depends upon an evaluation of the uncontradicted statements and averments, material to that issue, in the light of reported decisions addressed to the effect of proof of laches upon trade-mark litigation. Such statements and averments relate principally to a history of the conduct of the parties, respectively, as the same has a bearing upon the issue of laches. For purposes of this memorandum, the following composite summary of defendants' verified answer, defendants' Rule 42(b) motion and the affidavits attached to that motion will suffice to promote an understanding of the questions involved.

On December 23, 1952, defendant, O-So Grape Company, entered into a contract with defendant, Bubble Up Corporation, for the purchase from Bubble Up of the trade-mark "Bubble Up" and the good-will and business relating to that mark in the marketing and exploitation of a soft drink. Shortly thereafter, O-So Grape Company, pursuant to that contract purchased the said mark and business from Bubble Up Corporation for the sum of approximately $300,000. Prior

to its execution of that contract, O-So Grape Company, which is hereinafter referred to as Company, caused an investigation to be made by its house counsel and trade-mark counsel as to the value and validity of the "Bubble Up" mark and registry thereof. That investigation revealed that the mark "Bubble Up" was registered in the United States Patent Office under No. 141,244 on April 21, 1921, by the Sweet Valley Products Co., of Sandusky, Ohio, for use in connection with the marketing of a soft drink. Thereafter, in 1937, one Leroy O. Schneeberger, doing business as Bubble Up Company of St. Louis, Missouri, purchased the mark "Bubble Up", together with the business and the good-will pertaining thereto from Sweet Valley. On February 22, 1938, Schneeberger, d/b/a Bubble Up Co., as aforesaid, secured United States Trade-Mark Registration No. 354,840 covering the mark "Bubble Up" in conjunction with a representation of conventional bubbles as a trade-mark for a soft drink.

On October 2, 1942, plaintiff filed two suits in the United States District Court at St. Louis, Missouri, against the Cheer Up Sales Company and The Natural Set Up Sales Corporation, respectively, in which plaintiff alleged, respectively, that the registered trade-mark "Cheer Up", for a soft drink, and the registered mark "Natural Set Up", for a soft drink, infringed plaintiff's trade-mark "7 Up", and also "Seven Up." On August 16, 1943, while the above two cases were pending, plaintiff filed in the same court, a suit against Schneeberger, doing business as Bubble Up Company, alleging that the trade-mark "Bubble Up" was invalid and that that mark infringed plaintiff's mark "7 Up". The Cheer Up case was tried and on July 6, 1944, a judgment was entered finding and holding that plaintiff's trade-marks were not infringed by the mark "Cheer Up". Thereafter, plaintiff prosecuted the Cheer Up case to four further adverse decisions, the latter of these being a denial of plaintiff's petition for writ of certiorari by the United States Supreme Court

on October 14, 1946. See Seven Up Co. v. Cheer Up Sales Co., 8 Cir., 148 F.2d 909, certiorari denied 326 U.S. 727, 66 S.Ct. 32, 90 L.Ed. 431. Seven Up Co. v. Cheer Up Sales Co., 8 Cir., 153 F.2d 231, certiorari denied 329 U.S. 717, 67 S.Ct. 47, 91 L.Ed. 622.

After the adverse Cheer Up decisions, plaintiff abandoned and dismissed its suits against the marks "Natural Set Up" and "Bubble Up", although the latter case was at issue. In the approximately 13 years elapsed between plaintiff's dismissal of its suit against Schneeberger, defendant corporations received no notice or claim by plaintiff, either orally or written, that the trade-mark "Bubble Up" was invalid or that that mark infringed plaintiff's "7 Up" marks, until March 17, 1959, when plaintiff filed in the United States Patent Office a petition to cancel defendants' "Bubble Up" registrations. Three days later this suit was filed.

Also, during the interim period of approximately 13 years, between plaintiff's dismissal of the St. Louis suit and the filing of this cause, officers and agents of both plaintiff and defendants attended numerous national and state soft drink bottlers conventions at which both plaintiff and defendants had large and prominent displays of their respective products. On several occasions agents of plaintiff and defendants had conversations and written correspondence respecting common problems of the industry and respecting their use of their respective marks, to the end that the "Up" suffix should not become generic in the soft drink field; "Bubble Up" was nationally advertised in a number of periodicals, including the magazine "Life"; "Bubble Up" was advertised, exploited, distributed and sold openly in the public market both in the United States and in foreign countries; and plaintiff knew and was aware of defendants' activity in the sale and promotion of their product.

Since Company purchased the mark "Bubble Up" and the good-will and business connected therewith the growth of the business has steadily progressed;

On December 23, 1952, the product "Bubble Up" was marketed in interstate commerce in 26 States of the United States. In 1953, the first year of Company's ownership and operation of the business sales of "Bubble Up", expressed in terms of seven-ounce bottles, totaled 35,000,000 bottles. In 1958, shortly prior to the filing of this suit, "Bubble Up" was bottled and sold in 45 states and a number of foreign countries and sales of the product, expressed in terms of seven-ounce bottles, exceeded 144,000,000 bottles. In December, 1952, "Bubble Up" was bottled and distributed by 101 franchised and licensed bottlers in comparison with 253 franchised bottlers of the product at the time this suit was brought. Licensed bottlers holding a franchise for defendants' product have invested in excess of $5,000,000, in the development and exploitation of the product "Bubble Up", in addition to sums in excess of $1,000,000 expended by defendants and their licensed bottlers for advertising during the interim period of more than 6 years since December, 1952, when Company purchased the business. Defendants aver that all such investments would be practically a total loss should their "Bubble Up" mark be now destroyed.

Benjamin R. Koch, who is Executive Vice President of each of the defendant companies, states by his affidavit in support of the pending motion that he has been familiar with the soft drink bottling business for all of his business career, and that he has knowledge of the value and significance of an established, nationally-recognized, soft drink trademark; that, in the bottling business, it is virtually impossible to obtain new licensees and franchised bottlers for a soft drink, the trade-mark of which is in litigation, for the reason that such prospective licensees would be unwilling to risk the substantial investment required for exploitation of a franchise of that nature so long as there is any doubt as to the validity of the product's trademark; that he believes that plaintiff filed the present suit against defendants for the real purpose of embarrassing and harassing the defendants in the steady growth of their enterprise as a competitor of plaintiff's product; and that the long delay in instituting this suit has not been the result of any action of any of defendants, or their officers or agents.

The affidavit of Eugene R. Johnson, who is Secretary-General Counsel of defendant corporations, attests several contacts between himself and agents of plaintiff during the period from 1953 to the time of filing this suit relating to common problems in the trade and the use of their trade-marks, and further attests the fact that no notice or claim was ever asserted by the plaintiff against the "Bubble Up" mark prior to the filing of this suit. The latter affiant further states that defendants have already been, and will be, hampered in their defense of this suit by plaintiff's delay for the reasons that many witnesses having knowledge of material facts are now deceased, that witnesses interviewed are now hazy on their memory of material facts which occurred more than 16 years ago, and that correspondence, documents, records and advertising matter which would aid defendants' preparation of a defense to the claim have been long since destroyed.

The above summary of facts, taken largely from defendants' verified answer to the complaint, and from the affidavits of defendants' Executive Vice President and Secretary-General Counsel, is not intended as a complete resumé of all averments and verified statements of record which relate to the laches defense, but only as a sufficiently detailed summary thereof as will give direction to discussion of the question whether the laches defense, if the same be proved, would dispose of all issues of this case. If those averments and statements are a fair summary of the evidence upon which defendants will rely to support their laches defense in the absence of contradiction, for present purposes, it must be assumed that those documents do fairly summarize the evidence to be adduced by defendants on that issue, it

would appear that a decision in favor of defendants on the laches issue would dispose of all issues of this case, with the possible exception of any issues relating to unfair competition in defendants' use of current advertising. Moreover, consideration of those facts in the light of the applicable legal principles discussed below, convinces the court that it might also be inequitable and unjust to deny defendants' motion for a separate trial of the laches issue.

■■ Laches may create an estoppel when a long period of delay in asserting one's rights is accompanied by factors which would render it unconscionable to permit the claim of right to be asserted. George J. Meyer Mfg. Co. v. Miller Mfg. Co., 7 Cir., 24 F.2d 505, 507. That rule governs trade-mark infringement litigation as well as other chancery cases unless there is proof that an accused trade-mark has been, and is being, so used as to constitute a deliberate and continued attempt of one person to palm-off his goods on the purchasing public as the goods of another. In the latter event it appears that the courts act to protect the public interest, not the stale rights of the party claimant. Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60, is a good illustration of that postulate. There the plaintiff had adopted and continuously used, the name "Hunyadi", which was, originally, a wholly arbitrary symbol, as a part of its trade-mark in the marketing of mineral waters. Subsequently, defendant entered the market, bottling and selling the same type of mineral water under a trade-name containing the name "Hunyadi". Plaintiff made no protest against defendant's infringing use of plaintiff's arbitrary symbol until after the passage of some 20 years. Upon those facts the Court held that laches barred the plaintiff from all relief on account of the defendant's infringement of the mark "Hunyadi", but enjoined the defendant from its further use of a label for its bottles which was a Chinese copy of a label used by plaintiff in marketing an identical commodity.

The same result, with one exception, was reached in French Republic v. Saratoga Vichy Spring Co., 191 U.S. 427, 24 S.Ct. 145, 48 L.Ed. 247. There, plaintiff marketed mineral water under the trademark "Vichy" water. The Court held that the plaintiff was entitled to no relief, reasoning as follows: the mark "Vichy" used by plaintiff in marketing its water was, initially, a valid trademark; that plaintiff's acquiescence for a period of some 30 years in defendant's use of the word "Vichy" in its tradename for similar waters barred plaintiff's claim of an exclusive right to use the mark "Vichy"; and that all relief should be denied to plaintiff since defendant had adopted and used in its marketing of the water a distinctive label which was reasonably calculated to apprise the purchasing public of the source of defendant's product.

■ Acquiescence by a party claiming an exclusive right to a trade-mark in a long-standing infringing use by another of a similar mark may also create as between the parties, on the one hand, and as between the parties and the public, on the other, new correlative rights which the courts will not disturb. In Pflugh v. Eagle White Lead Co., 3 Cir., 185 F. 769, the plaintiff alleged trade-mark infringement and unfair competition in defendant's marketing of white lead products. The plaintiff owned a registered trademark for white lead products upon which a pictorial eagle was a prominent feature and a registered mark for such products consisting of the printed word "Eagle." After plaintiff's registration of its marks, defendant began marketing white lead products under the trade-name "Gold Eagle", employing in conjunction therewith on its package labels a pictorial eagle. It also appeared that the pictorial eagle was used by other competitors in the white lead field, and that such use by defendant and others had continued for a period of some 14 years before suit was filed against the defendant. The trial court found that plaintiff's claim for an accounting was barred by its laches, but further found that defend-

ant's use of "Gold Eagle" and the pictorial eagle constituted an infringement of the plaintiff's marks. Further use by defendant of its "Gold Eagle" tradename and the pictorial eagle in the marketing of white lead was enjoined.

On appeal, the judgment granting injunctive relief was reversed, the court holding that laches and plaintiff's acquiescence in defendant's use of its "Gold Eagle" name were a bar to any relief. In pertinent part, the court said, 185 F. at pages 772–773:

"In view of these facts, of the asserted and exercised right of the respondents to use the eagle during this period of fourteen years, of the acquiescence of the complainant in that use, and of the further fact that the respondents' label is so different that by no possibility could it be mistaken for complainant's trademark * * * it is clear the complainant is not entitled to the relief prayed for. The simple fact is that the eagle is not the exclusive trademark of its white lead. It is equally the trade-mark of the respondents, and as the trade-mark of the respondents, under adverse claim of right the latter have presumably during these 14 years gone on extending their trade under that brand. The continued, persistent, and adverse use of the eagle by the respondents * * * during all these years, shows an abandonment of an exclusive claim by the complainant. And on such abandonment new rights have meanwhile arisen on the part of the public. The trade of the respondents has been continued and built up further upon their trade label, on which an eagle appeared.

"We are not unmindful of Menendez v. Holt, 128 U.S. [514], 524, 9 S.Ct. 143, 32 L.Ed. 526. * * * that mere failure to enforce trademark rights will not preclude injunctive relief when it is sought. But those were cases where, as said in Menendez v. Holt, supra, there was nothing 'in the nature of an estoppel,

nothing which rendered it inequitable to arrest at this stage any further invasion of complainant's right.' In this case there is. The complainant notified the respondents of its alleged rights; the respondents positively asserted their adverse rights; the complainant acquiesced in the respondents building up their trade under their label for 8 years without further objection; then complainant notified again and again, but respondents stood their ground and continued for 6 years more to build up their adverse trade-mark rights before complainant again broke its silence by asserting an exclusive right by filing this bill.

"Under such facts it would, in our judgment, be inequitable to arrest at this stage the respondents' trade * * *."

■ It thus appears that plaintiff's contention that laches may bar the right to an accounting, but never the right to injunctive relief against further use of an infringing mark, is only half correct. Even clear-cut infringment of a registered mark, if it is permitted to continue for a long period of time, may be immune from mandate of an injunction for the reason that the mark has become generic, French Republic v. Saratoga Vichy Spring Co., supra, or for the reason that the exclusive right to use of the mark has been abandoned, Saxlehner v. Eisner & Mendelson Co., supra, or for the reason that the actions of a merchant in the use of an infringing mark, together with the knowledge of such use and acquiescence therein by the owner of the infringed mark, are such as to create, in equity, a presumptive public awareness that a particular commodity is sold by two or more persons under similar or identical trade-marks giving use to new correlative rights which a court of equity will not disturb. Pflugh v. Eagle White Lead Co., supra; Anheuser-Busch, Inc., v. Du Bois Brewing Co., 3 Cir., 175 F.2d 370, 375.

■■ It is impossible to reconcile all that courts have said relative to the ef-

fect of laches on the right to injunctive relief against an infringing trade-mark, but the rationale of pertinent cases is that the question of whether injunctive relief against infringement will be granted or •withheld depends upon a weighing of all relevant proof in each particular case. Thus, where elements of both laches and estoppel were present in a trade-mark infringement suit, injunctive relief was nevertheless granted upon a finding that the defendant's adoption of the infringing mark constituted a studied attempt to trade on the reputation and good-will of the plaintiff to the detriment of the public. A. E. Staley Mfg. Co. v. Staley Milling Co., 7 Cir., 253 F.2d 269. Compare, France Milling Co. v. Washburn-Crosby Co., 2 Cir., 7 F.2d 304: injunctive relief was denied upon evidence that France's "Gold Medal" trade-name for pancake mix was adopted without any intent to trade upon Washburn's "Gold Medal" trade-mark for wheat flour, and upon evidence of Washburn's knowledge of, and acquiescence in, France's use of "Gold Medal" for more than 10 years. On the other hand, if it appears that injunctive relief would be inequitable and would work an injustice, such relief will be denied on proof of laches, even as against an infringing use of an identical trade-name. E. g., Thomas J. Carroll & Son Co v. McIlvaine & Baldwin, 2 Cir., 183 F. 22; Dwinell-Wright Co. v. White House Milk Co., 2 Cir., 132 F.2d 822. Anheuser-Busch, Inc. v. Du Bois Brewing Co., 3 Cir., 175 F.2d 370.

The plaintiff in the Carroll case, supra, was a liquor wholesaler in the Baltimore area. The defendant was a liquor wholesaler in the New York area. Each adopted the name "Baltimore Club" for one of its blended whiskeys, and each used that name for approximately 20 years before suit was brought for trade-mark infringement. In denying plaintiff injunctive relief, the court stressed the following factors: (1) good-faith adoption of the trade-name by defendant; (2) the establishment by defendant during the 20 year period of a sub-stantial business under the "Baltimore Club" trade-name; (3) the use by defendant of a distinctive label, not likely to be confused with plaintiff's "Baltimore Club" label; (4) the embarrassment of defendant in its defense because of long delay; and (5) plaintiff's knowledge of, and acquiescence in, defendant's use of the trade-name over a long period of time.

In Dwinell-Wright Co. v. White House Milk Co., supra, the plaintiff had used the trade-name "White House", coupled with a pictorial representation of the White House in Washington, in the sale of coffee and tea from about 1888. In 1910, it registered both the name and pictorial representation of the White House as trade-marks for its products. Defendant, a subsidiary of A & P Tea Company, used the trade-name "White House", together with a pictorial representation of the White House in Washington, on its labels used in marketing condensed milk. Defendant's user, dating back through predecessors to the year 1917, was known to plaintiff as early as 1920, approximately 16 years before the suit was brought for trade-mark infringment. During that period of time, plaintiff had marketed its products through the A & P stores, it had knowledge that "White House" milk and its "White House" products were both sold by A & P and that, at times, plaintiff's and defendant's products were advertised by A & P in the same advertising format. In affirming a judgment denying injunctive relief to the plaintiff, the court stressed the inequity of destroying defendant's business in the light of the facts of the case. The able opinion of Judge Learned Hand is worthy of quotation in pertinent part but to do so would unduly lengthen this opinion.

So too, in Anheuser-Busch, Inc. v. Du Bois Brewing Co., 3 Cir., 175 F.2d 370, injunctive relief was denied to the owner of an infringed trade-mark upon proof of almost 35 years delay in the owner's assertion of an exclusive right to the use of the mark. Anheuser and its predecessors had used the trade-mark "Bud-

weiser" in the marketing of beer beginning in 1876. In 1905 Du Bois, a small brewer, began marketing some of its beer under the name "Du Bois Budweiser". In 1908 Anheuser's predecessor filed a suit to enjoin Du Bois' use of the Budweiser name but it voluntarily dismissed the suit the following year. Nothing more was done by Anheuser and its predecessors until a second suit for injunctive relief was filed by Anheuser in 1940. The trial court entered judgment enjoining Du Bois from the further use of the "Budweiser" name. That judgment was reversed, (one judge dissenting), the court holding that Anheuser had been grossly remiss in the following particulars, to-wit: (1) Dismissal of the 1908 suit, followed by a delay of more than 30 years before again asserting an exclusive right to use of the mark; (2) Anheuser's acquiescence in Du Bois' use of the "Budweiser" name; (3) the acquisition by Du Bois in its marketing area of a substantial goodwill in the name "Du Bois Budweiser"; and (4) the dulling of Du Bois' ability to defend the suit by the passage of time and the death of some key witnesses; and that those factors made it unjust and inequitable to enjoin Du Bois' further use of the mark.

Finally, before leaving this field of discussion, it is appropriate to note the language of the court in Valvoline Oil Co. v. Havoline Oil Co., D.C.S.D.N.Y., 211 F. 189, 195, as follows:

> "But it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for and accomplished—especially in a case where the most that can be said is that the trade-mark infringement is a genuinely debatable question."

See also, Pflugh v. Eagle White Lead Co., 3 Cir., 185 F. 769, 772; France Milling Co. v. Washburn-Crosby Co., 2 Cir., 7 F.2d 304, 306.

■ Plaintiff urgently insists that every adjudicated infringement of a registered mark will be enjoined, irrespective of the proof of laches, to protect the public from confusion and deception; that, therefore, proof of laches in this case would still leave the infringement issue for decision. That contention is not wholly correct. The principle to be distilled from the reported cases is that continued use of an infringing mark may be enjoined, irrespective of the existence of laches, when the circumstances of the particular case require that result; and protection of the public is merely one element which influences that decision. Neither G. W. Cole Co. v. American Cement & Oil Co., 7 Cir., 130 F. 703; Rosenberg Bros. & Co. v. Elliott, 3 Cir., 7 F.2d 962, nor Jenkins Bros. v. Kelly & Jones Co., 3 Cir., 227 F. 211, upon which plaintiff's principal reliance is placed, involved any issue of laches. Neither is particularly helpful here.

Moreover, it is error to assume that the public right to, and need for, protection is a constant factor. On the contrary, the depth of such public right and the existence of such need vary as the circumstances of the use of an infringing mark vary from case to case. They also vary correlatively with the similarity, or lack of similarity, of the particular competing marks being considered.

In Rosenberg Bros. & Co. v. Elliott, supra, the complainant manufactured men's clothing under the registered and nationally-known trade-mark "Fashion Park". Defendant, who operated a retail store for men's hats and caps, began using a "Fashion Park" label on his products and in his advertising after complainant's mark became nationally accepted. Defendant's use of the mark was enjoined. Under similar facts in the Anheuser-Busch case, supra, i. e., the use in a restricted marketing area of an infringing mark which was essentially identical to a prior-right, nationally-known, competing mark, the same court indicated that laches and the lapse of time had created a public awareness of

the infringing use which abated the likelihood of public confusion. If you add to the facts of the Rosenberg case protracted delay in the plaintiff's assertion of its rights, after knowledge of the infringing use, and other factors which existed in the Anheuser case, it would require more naivete than I possess to assume that the decision in Rosenberg would nevertheless have been the same.

It is obvious also that the likelihood of public confusion, and the correlative need for public protection may be great on an exact or near duplication of marks, as, for example, in the competing marks, "Blue Ribbon" and "Blue Ribbon" on paper products, Oakford Co. v. Kroger Co., D.C.S.D.Ill., 157 F.Supp. 453; "Fashion Park" and "Fashion Park" used on men's clothing, Rosenberg Bros. & Co. v. Elliott, supra; "Staley's" and "Staley" or "Staleys" used on animal feeds, A. E. Staley Mfg. Co. v. Staley Milling Co., supra; "Kelly Valve" and "Standard Kelly Valve" used on faucet valves, Jenkins Bros. v. Kelly & Jones Co., supra; "Aladdin" used on kerosene lamps and "Aladdin" used on portable electric lamps, Mantle Lamp Company of America v. Aladdin Mfg. Co., 7 Cir., 78 F.2d 426; "Stronghold" and "Stronghold" used on ribbed nails, Independent Nail & Packing Co. v. Stronghold Screw Products, 7 Cir., 205 F.2d 921, certiorari denied 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391; "Spice Islands" and "Spice Land" used on spice products, Spice Islands Co. v. Spice Land Products, 2 Cir., 262 F.2d 356; and "Coppertone" and "Copper Tan" used on sun-tan oils, Douglas Laboratories Corp. v. Copper Tan, 2 Cir., 210 F.2d 453. That likelihood and need is lessened, eventually to the point of disappearance as the visual and auditory similarity between competing marks decreases, as, for example, in the competing marks "3-in-1" and "Big 4" used on oils, G. W. Cole Co. v. American Cement & Oil Co., supra; "A'Lure" and "Jantzen Curvallure" used on brassieres, Warner Brothers Co. v. Jantzen, Inc., 2 Cir., 249 F.2d 353; "Head-On Basser" and "Millsite Bassor" used on fishing plugs, James

Heddon's Sons v. Millsite Steel & Wire Works, 6 Cir., 128 F.2d 6; and "7 Up" and "Cheer Up" used on soft drinks, Seven Up Co. v. Cheer Up Sales Co., 8 Cir., 148 F.2d 909, certiorari denied 326 U.S. 727, 66 S.Ct. 32, 90 L.Ed 431.

In the final analysis, even on a clear-cut case of infringement, delay of the owner of the infringed mark to assert his right and protracted acquiescence in the infringing use of a similar, or even identical, mark, may create a presumptive public advisement of the facts sufficient to have negatived the likelihood of confusion, and may even establish a public right to have the status quo maintained. Pflugh v. Eagle White Lead Co., supra, 185 F. at page 772. Cf., Anheuser-Busch, Inc. v. Du Bois Brewing Co., supra, 175 F.2d at page 375; Thomas J. Carroll & Son Co. v. McIlvaine & Baldwin, 2 Cir., supra. Compare suggestion of Judge Learned Hand in the White House case, supra, 132 F.2d at page 825, that delay and acquiescence might not bar injunctive relief against an infringing mark "in the case of deliberate and continued palming off * * *."

Nothing said in this memorandum is intended by the court to express any opinion as to the merits of the laches defense or of any other issue in the case. An appraisal of the question, whether a decision on the laches issue would dispose of this litigation should defendants prevail, necessarily requires an analysis and evaluation of the case law in the field in the light of undisputed facts averred in support of defendants' motion for a separate trial of that issue. One concomitant of that necessary analysis is the possible impression that the court has herein pre-judged the merits of the laches defense. That impression is not a true one; judgment on the merits of that defense must abide an evaluation of the evidence adduced on the trial thereof.

It appears to the court that the defense of laches, if proved, would act as a bar to essentially all of plaintiff's claims. From the standpoint of both the court and the parties, it is better

to fight the battle which might win the war, than to by-pass the battle and fight the whole war as a means for determining whether, in the first instance, the battle should have been fought.

Invoking the broad discretion vested in the court by Rule 42(b), defendants' motion for a separate trial of the laches issue will be allowed and all further proceedings in the cause, whether on deposition or otherwise, will be held in abeyance pending the trial of that issue, and it is hereby so ordered.